35 U.S. 25
 10 Pet. 25
 9 L.Ed. 333
 SAMUEL D. HARRIS AND OTHERS
v.
JESSE D. ELLIOTT.
 January Term, 1836
 
 1
 ON a certificate of division between the judges of the circuit court of the United States for the district of Massachusetts.
 
 
 2
 This was an action of trespass quare clausum fregit, instituted in the circuit court of the United States at October term 1833, against the defendant, Jesse D Elliott, the commandant of the United States navy yard at Charlestown, Massachusetts; in order to determine the title claimed by the plaintiffs as heirs of John Harris, formerly of Charlestown, Massachusetts. The United States, the real possessors, and asserting an ownership of the property, took defence in the suit; being desirous of having the rights asserted by the plaintiffs ascertained and determined.
 
 
 3
 The cause was submitted to the court on a statement of facts agreed upon by the counsel for the plaintiffs, and the district attorney of the United States. They were as follow:
 
 
 4
 'In the year 1780, a committee appointed by the town of Charlestown, in the county of Middlesex, in the state of Massachusetts, projected certain streets in said town, and laid them down on a map or plan, which was deposited and now remains in the office of the secretary of state of the commonwealth of Massachusetts; and on the thirtieth day of October, 1781, the legislature of said commonwealth passed an act confirming the doings of said committee, and barring actions in certain cases therein specified. The street now called Water street (being the most southerly street on said plan) was not in fact entirely laid out by said town until the year 1795 or 1796, (a street commonly called Battery street, which ran in the same direction, being used as a highway until that time,) and that the most northerly street on said plan, called Henley or Meeting-house street, was not in fact laid out by said town until the year 1798 or 1799.
 
 
 5
 'That John Harris, late of said Charlestown, merchant, deceased, purchased several parcels of land in said Charlestown, viz. one parcel of Andrew Newell, by deed duly executed on the 11th day of January, 1791, described as follows: a tract of land containing five acres more or less, bounded southwesterly on land of Joseph Barrell; northwesterly on a road leading to the brick-kilns; northeasterly on a highway leading from the Battery to Moulton's Point; southeasterly on Charles river down to low water mark; saving and reserving a highway through the same from the Battery to Moulton's Point. Another parcel of land of Joseph Barrell, by deed duly executed on the 16th of June, 1792, viz. a certain piece of land, bounded and measuring as follows, viz. front on Battery street, S. S. E. there measuring one hundred and seventy-seven feet; upon land of Andrew Newell, E. N. E. four hundred and fifty-eight feet; upon Back lane, N. N. W. one hundred and eighty-four feet; upon land of the heirs of Joseph Leman, Esq. W. S. W. four hundred and fifty feet; then turning upon said Leman's land, W. S. W. fifty-seven feet, till you come into Battery street. Also, a part of a wharf and land upon Battery street, opposite to where the cellar stands, on said lane, measuring upon Battery street, N. N. W. one hundred and fourteen feet; on Charles river, S. S. E. and continues the same breadth to low-water mark, or however otherwise bounded, or be the same measure more or less, together with all the rights, privileges, and appurtenances to said granted land and premises. Another parcel of land of John Larkin, by deed duly executed 6th July, 1793, viz. a certain parcel of land containing about one acre and one half, bounded on land of John Harris, W. S. W. on said Harris, southerly, on land of Captain Thomas Edes; sougherly, on land of Captain Thomas Harris and Amos Sampson, W. S. W. on Back lane, N. N. W. on John Harris, formerly Joseph Barrell, Esq. E. N. E. to Battery street. Another parcel of land of David Munroe, by deed duly executed on the third day of April, 1793, viz. a piece of land containing by estimation about one-eighth of an acre, butted and bounded as follows, viz. easterly and northerly by land formerly of Edward Wilson, but lately _____ Lemmon; westerly by land formerly of Colonel John Phillips and lately owned by Benjamin Wheeler, deceased, and southerly by the street or highway called Wapping street, or however otherwise bounded or reputed to be bounded. The above described parcels of land comprise the two parcels of land described in the writ and are parts of the land covered by said streets as laid down on said plan and afterwards laid out.
 
 
 6
 'The said town of Charlestown, in the year 1795 and 1796, laid out the easterly part of the southerly highway on said plan (now called Water street) over a part of the former Battery street, and a part of the land of said John Harris, conveyed to him as above described, and the said John Harris, by the award of referees, dated July 25, 1796, received from said town a part of the land forming the old (Battery) street and the sum of four hundred and fifty dollars in damages for taking his land over which said highway passed. The following is a copy of said award:
 
 
 7
 'The subscribers, referees chosen to determine a difference between the town of Charlestown on one part, and John Harris, of said Charlestown, merchant, on the other part, pursuant to a law for amending the streets of said town, laid waste by fire by the British troops, have met and fully heard the parties, and viewed the premises, and considered the disadvantage to the said John Harris's lots on the street leading from the swing bridge to the place of the old battery, in said Charlestown, (so far as the same has not been heretofore settled,) by taking a part of said lots into the street, and also the advantage derived to said lots by discontinuing the old street, where it does not make a part of the present street, and also the advantage of the new street being more wide, commodious, and direct, than the old street was—do award that the said town of Charlestown do pay to the said John Harris the sum of four hundred and fifty dollars, and relinquish all claims to that part of the old street which comes within said lots, as they are left by the said new street. The lots considered extend on the northwest side of the street, from the northeast corner of Thomas Edmands, formerly Henley's, to a place marked on the plan by the word 'stump,' being on the plan a corner of a street proposed to lead to the meeting house, but not yet opened. The town of Charlestown are to pay the cost of the referees, and the tavern bill of the house where they set.
 
 
 8
 'Done at Charlestown, the 25th day of July, A. D. 1796.
 
 
 9
 'JAMES WINTHROP,
 
 
 10
 'MATTHEW CLARK,
 
 
 11
 'AMOS BOND, Referees.
 
 
 12
 Referees.
 
 
 13
 'That in the year 1798 or 1799, the said town of Charlestown laid out the most northerly street or highway, marked on said plan, called Meeting-house or Henley street, through and over the land of said John Harris, conveyed to him as above recited, and on the _____ said John Harris received from the said town of Charlestown the sum of _____ in damages for taking the land belonging to him, over which said street last mentioned passed.
 
 
 14
 'That in the year 1800, the government of the United States, under the authority of the statute of Massachusetts passed June 17, 1800, purchased of said John Harris several parcels of land in said town of Charlestown, which are now included within the limits of the navy yard in said town. The value of the land so taken was ascertained by the verdict of a jury (agreeably to the provisions of said statute.) And on the 29th November, 1800, and 6th February, 1801, said Harris received from the United States the sums so ascertained, as the value of said lands.
 
 
 15
 'The proceedings in ascertaining the value of said lands were as follows:
 
 
 16
 'Commonwealth of Massachusetts. To the honorable the justices of the court of general sessions of the peace, begun and held at Concord, in and for the county of Middlesex, on Monday next preceding the second Tuesday of September, A. D. 1800.
 
 
 17
 'The petition of Aaron Putnam, agent of the United States of America, respectfully sheweth, that your petitioner having been directed by the Government of the United States to purchase a certain tract of land in Charlestown, for a navy and dock yard for the United States, and not being able to agree with Mr. John Harris, of said Charlestown, for sundry lots of land belonging to him, which lots are within the limits pointed out by the Government, your petitioner, therefore, prays that the honorable court would order the sheriff of said county to summon a jury to appraise and value said lots or tracts of land, that the United States may possess the same at a fair and equitable value, agreeably to a law of the said commonwealth in that case made and provided.
 
 
 18
 'September 11, 1800.
 
 
 19
 'AARON PUTNAM,
 
 
 20
 'Agent for the United States.
 
 
 21
 'October 22, 1830. A copy.
 
 
 22
 'Attest, A. BIGELOW, Clerk.
 
 
 23
 'Middlesex, ss. 4th October, 1800.
 
 
 24
 'We, the jury, empannelled and sworn, as before certified, having been shown several lots of land, which belong to John Harris, of Charlestown, in the county of Middlesex, merchant, lying within the limits mentioned in the act in this case made and provided, and fully heard the said Harris; as well as Aaron Putnam, Esquire, agent for the United States, together with the testimony by them respectively produced touching the value of the said lots, we have set out the said lots by metes and bounds, and do appraise and value the same as follows, viz. one lot containing five acres, two quarters and thirty-five rods, bounded as follows: beginning at the northerly corner of Amos Samson's land, by the lane which leads to the brick yards, thence running southerly, as the fence now stands, partly by land of the said Samson, and partly by land of Thomas Harris, to the street lately laid out from the meeting-house to Charles river, thence running easterly on the same street until it comes to a cedar post marked, with stones about it; thence running in the same direction to a stake and stones; thence running northerly on a straight line to a post in the fence, with the top hewn on all sides; thence running still northerly, as the fence now stands, to the lane first mentioned; thence running westerly by the same lane to the place first mentioned, which same tract of land on our oaths we do appraise and value at thirteen thousand dollars and no more.
 
 
 25
 'Also, one other lot of land, with the appurtenances, containing one-half of an acre, bounded as follows, viz. beginning at a stake and stones, by the street lately laid out from the meeting-house to Charles river, thence running southerly by land of Thomas Edes, until it comes to a post in the southeasterly corner of said Edes's fence by Battery street, thence running northerly by the same street till it comes to a stake and stones standing where the same street meets the street lately laid out as aforesaid; thence running southwesterly by the same street to the stake and stones first mentioned; which same tract and lot of land we do, on our oaths, appraise and value at thirteen hundred dollars and no more.
 
 
 26
 'Also, one other lot of land, containing one acre and two quarters, more or less, bounded as follows, viz. beginning at a stake and stones, where Wapping street and Battery street intersect each other; thence running northeasterly by Battery street, to a stake and stones by land claimed by the said Edes, and in dispute between him and the said Harris; thence running southeasterly by the same land to low-water mark; thence running southwesterly by low-water mark till it comes to Wapping street aforesaid; thence westerly by the same street to the stake and stones first mentioned; which same tract of land we do, on our oaths, appraise and value at one thousand five hundred dollars and no more.
 
 
 27
 'Also, one other tract and lot of land containing three quarters of an acre, more or less, bounded as follows, viz. beginning at a stake and stones by Battery street, by the northwesterly corner of the lot of land last described, thence running southeasterly by the same lot of land to low-water mark; thence running northeasterly ninety-seven feet, by low-water mark; thence running northwesterly on a straight line to a stake and stones by Battery street aforesaid; thence southwesterly by the same street to the stake and stones first mentioned; which same tract of land we do, on our oaths aforesaid, appraise and value at five hundred dollars and no more.
 
 
 28
 'Also, one other lot of land, containing one acre and one-quarter, more or less, bounded as follows, viz. beginning at a stake and stones at the northwesterly corner of the lot of land last described, thence running northeasterly by said Battery street to land of John Larkin; thence running southeasterly by land of said Larkin to low-water mark; thence southwesterly by low-water mark to the piece and lot of land last described; thence northwesterly by the same lot of land to the stake and stones first mentioned, which same lot of land we do appraise and value, on our oaths aforesaid, at the sum of seven hundred and eighty-seven dollars and no more.
 
 
 29
 'In witness whereof, &c.
 
 
 30
 'The foregoing is a true copy of the verdict of the jury summoned by the sheriff of the county of Middlesex, by virtue of a warrant to him directed, which issued from the court of sessions for the county of Middlesex, on the application of Aaron Putnam, agent for the United States, to appraise the value of certain lands taken for a navy and dock yard in Charlestown for the United States, which lands belonged to John Harris of said Charlestown. Which verdict is annexed to said warrant, and on file with the files of said court of sessions for September term, 1800.
 
 
 31
 'Attest, A. BIGELOW, Clerk.
 
 
 32
 'Clerk's office, Cambridge, October 27, 1830.
 
 
 33
 'The street called Battery street in the foregoing description is now called Water street.
 
 
 34
 'It appears from the aforegoing description, that such part of the street as was given up to said Harris, by the town, by the award of the referees, on the 25th July 1796, was included in the transfer to the United States and paid for by them.
 
 
 35
 'That on the 14th day of January 1801, a committee of the town of Charlestown, appointed to consider the subject of granting or exchanging the roads and streets for the accommodation of the navy and dock yard, having conferred with the agent of the United States, and examined the land particularly located for that purpose, made a report, which was adopted by the town, and is as follows: 'That in consideration of the benefit expected from so important an establishment, such parts of the following streets and passage ways belonging to the town as are included in the limits of the navy and dock yard, be granted for the sole use of the United States, and that their termination from the Main street be as follows: the street laid through the land lately belonging to Mr John Harris, by a line across the same from the easterly bounds of the land of Capt. Thomas Edes; the Wapping and Battery streets by a line across the same on the easterly bounds of a passage way twenty-one feet wide, belonging to the town, which leads to low-water mark; the road leading to Moulton's point by a line across the same from the northerly bounds of the land lately belonging to Aaron Putnam, Esq.: provided, however, that if the navy and dock yard should be discontinued, or the land converted by the United States to private uses, these grants shall be void, and the aforesaid streets and passage ways shall be opened as before for the use and accommodation of the town.'
 
 
 36
 'John Harris requested an entry of his protest to the report on account of his right to the advantages of the said streets.
 
 
 37
 'That from and after the passing of the foregoing vote the two streets marked on the said plan, so far as the same are contained within the limits of said navy yard, were, and have been discontinued, and have ceased to be used as public highways, and have been used as a part of the navy yard.
 
 
 38
 'That at the time the United States took the land of John Harris there were three wooden buildings on lot No 2, and no buildings on the other lots.
 
 
 39
 'That said John Harris at that time owned a small gore of land adjoining the west end of lot No 2, which was sold by his administrators to Commodore Hull in 1817, and afterwards sold by said Hull to the United States. The same gore of land is now enclosed within the walls of the navy yard.
 
 
 40
 'That the town of Charlestown, on the 2d March 1801, sold to Aaron Putnam a part of the road leading to the brick-yards, which said Putnam afterwards, on the 2d of April 1801, sold to the United States, and it is now within the limits of the navy yard.
 
 
 41
 'That said John Harris died on the 19th of October 1804, (having devised all his real estate to his brothers, Thomas Harris and Jonathan Harris, who, together with a neice, to whom said John gave an annuity, were the heirs at law of said John) never having made an entry on the land covered by said streets, nor did the said Thomas or Jonathan ever enter therein.
 
 
 42
 'That said Thomas Harris died on ___ of June 1814, intestate, and his estate descended to his children, Thomas Harris, John Harris, and Mary Coleman.
 
 
 43
 'That said Jonathan Harris died on the 14th day of August, 1814, intestate, and his estate descended to his children, Samuel D. Harris, Richard D. Harris, Charles Harris, Henry Harris, Mary Harris, Charlotte Harris, and Augusta Harris; and that the said Charlotte and Augusta were infants within the age of twenty-one years, at the time of the decease of the said Jonathan, than, and the other children of said Jonathan were of full age, at the time of his decease. That the heirs of said Jonathan and Thomas Harris claim to hold said two parcels of land, described in the writ, as tenants in common; and that the said Richard for himself, and the other heirs of said Jonathan, and the heirs of said Thomas above mentioned, made an entry into said two parcels of land on the 4th September, 1830, claiming title to the soil and freehold thereof, but have been constantly repulsed and kept out of possession by the officers of the United States in command of the navy yard, and particularly at the time of the trespass complained of in this action by the present defendant, the commandant of the navy yard. A similar entry was made on the 11th September 1833, which was repulsed in the same manner.
 
 
 44
 'An act for widening and amending the streets, lanes, and squares, in that part of the town of Charlestown which was lately laid waste by fire. Passed 30th October 1781.
 
 
 45
 'Whereas, great desolation and destruction was, some time since, made by the British troops in Charlestown, wantonly destroying the same by fire. And whereas, a committee was appointed by the town aforesaid, for regulating the streets, lanes, and squares in that part of the town which was so laid waste, and the committee hath accordingly proceeded to lay out the same; a plan whereof hath been laid before this court, and is now deposited in the secretary's office.
 
 
 46
 'Sec. 1. Be it therefore enacted by the senate and house of representatives in general court assembled, and by the authority of the same, That the said proceedings of the committee be, and are hereby confirmed; and all actions that shall be brought for recovering possession of any land lying within any of the streets, lanes, squares, &c., laid out as aforesaid, or for damages sustained or occasioned thereby, shall be utterly and forever barred.
 
 
 47
 'Sec. 2. And be it further enacted by the authority aforesaid, That no building whatsoever be so erected as to encroach upon any street, lane, or square, by them laid out as aforesaid; and that every building so erected be deemed a nuisance, and be accordingly taken down or removed by the order of any two justices for the county of Middlesex, or the selectmen of Charlestown, the charge of such removal to be paid out of the moneys which shall be raised by the sale of the materials of such building, which, by the order of said justices or selectmen, shall be sold for that purpose, unless the said charges shall be immediately paid by the owner.
 
 
 48
 'Sec. 3. And be it further enacted by the authority aforesaid, That if any person or persons whatsoever shall wittingly or willingly, without good authority, pluck up or remove any of the stakes or boundmarks which have been or shall be fixed or set up by said committee, to distinguish and ascertain the streets aforesaid, and shall be thereof convicted before any justice of the peace for the county of Middlesex, each and every person so offending shall forfeit and pay the sum of forty shillings, for the use of said town, or, on failure thereof, shall suffer imprisonment for the space of two months: And whereas some persons may suffer damage by laying out the streets, &c. according to the plan aforesaid, and others may receive benefit and advantage thereby——
 
 
 49
 'Sec. 4. Be it further enacted by the authority aforesaid, That the value of all lands and buildings and other materials taken from any person by virtue of this act, shall be determined by three persons mutually chosen for that purpose, one of which shall be appointed by the selectmen, or a committee chosen for that purpose, which person so appointed by the selectmen or committee, shall not be an inhabitant of the town, and the other by the party interested in the land, which two shall choose a third, and the judgment of the three persons, or any two of them, so chosen, shall be final in the case, and the town held and obliged to pay to the person interested in the land, buildings, or materials, aforesaid, the sum at which it may be appraised as aforesaid.
 
 
 50
 'Sec. 5. And be it further enacted by the authority aforesaid, That in any case where the whole of any person's land may not be taken away by the plan aforesaid, the appraisers aforementioned, in estimating the sum said person shall receive, shall consider the advantage his remaining land receives, as well as the value of land taken from him by the plan aforesaid, and from a consideration of all circumstances determine the sum of money such person shall receive as aforesaid.
 
 
 51
 'And whereas some estates may be advantaged and rendered more valuable by the execution of the plan aforesaid——
 
 
 52
 'Sec. 6. Be it therefore enacted by the authority aforesaid, That the selectmen, or a committee appointed by the town for that purpose, shall have power to call upon all persons whose estates (in their opinion) are benefited by the execution of the plan aforesaid, to join in the appointment of appraisers in the manner before provided in this act for estimating damages as aforesaid; which appraisers shall have full power and authority to determine the sum that the owner of any estate so benefited ought to pay; which estate shall be subjected to make good the sum so awarded by the appraisers aforesaid.
 
 
 53
 'And whereas the house lots of Richard Devans, Esq. and Messieurs Ebenezer Breed and Jonathan Penny are taken away by the plan aforesaid——
 
 
 54
 'Sec. 7. Be it further enacted by the authority aforesaid, That the selectmen of the town aforesaid, or a committee appointed by the town for that purpose, shall be held and obliged to procure good and sufficient house lots for said Richard Devans, Ebenezer Breed, and Jonathan Penny, which, in the opinion of appraisers to be chosen as is before provided by this act, shall be equal in value and convenience to those taken away as aforesaid. And when said house lots are procured for the persons aforesaid, then their lots and buildings shall be under the same rules and regulations as to moving the buildings thereon, as is before provided by this act for removing and preventing encumbrances and nuisances.
 
 
 55
 'And whereas some persons, in order to defeat the good purposes designed by this act, may refuse or neglect to join in the appointment of appraisers, as is before herein provided——
 
 
 56
 'Sec. 8. Be it further enacted by the authority aforesaid, That if any person or person shall, after being duly notified thereof by the selectmen of the town, or a committee appointed for that purpose, refuse or neglect to join in the appointment of appraisers as aforesaid, then it shall and may be lawful for the selectmen, or committee, aforesaid, to apply to any two justices of the peace in the town of Boston; which two justices shall, upon such application, notify the party so refusing or neglecting, and after such notice duly given, the said two justices shall have full power and authority to appoint any three freeholders of the town of Boston, who shall have the same power and authority in valuing any piece of land; and all persons shall be as fully bound thereby as though the parties had joined in the appointment.
 
 
 57
 'And whereas the inhabitants of the town of Charlestown are, by reason of their losses in this present war, so reduced in their circumstances as to be rendered unable, without the assistance and encouragement of the public, to carry said plan into execution——
 
 
 58
 'Sec. 9. Be it further enacted by the authority aforesaid, That from and after the passing of this act, there shall be allowed and paid out of the public treasury of this commonwealth, to the honoral Nathaniel Gorham, Esq. Thomas Russell, Esq. and Mr. David Wood, jun. or the survivor of them, one-half of all the taxes paid by the town of Charlestown, for the space of seven years, to be applied to the purposes before mentioned.
 
 
 59
 'Sec. 10. And be it further enacted, That the treasurer of this commonwealth be, and hereby is, directed to pay into the hands of the said Nathaniel Gorham, Thomas Russell, and David Wood, jun., or the survivor of them, one-half of all the taxes laid upon said town, for the purposes aforesaid.
 
 
 60
 'An act authorizing the United States to purchase a certain tract of land in Charlestown, for a navy yard. Passed 17th June, 1800.
 
 
 61
 'Sec. 1. Be it enacted by the senate and house of representatives, in general court assembled, and by the authority of the same, That the consent of this commonwealth be, and hereby is, granted to the United States, to purchase a tract of land situated in the northeasterly part of the town of Charlestown, in the county of Middlesex, adjoining and bounded on two sides by Charles and Mystic rivers, not exceeding sixty-five acres, exclusive of flats, for the purpose of a navy or dock yard, or both of them, and erecting magazines, arsenals and other needful buildings. The evidence of the purchases aforesaid, to be entered and recorded in the registry of deeds in the said county of Middlesex. Provided always, and the consent aforesaid is granted upon the express condition that this commonwealth shall retain a concurrent jurisdiction with the United States, in and over the tract of land aforesaid, so far as that all civil, and such criminal, processes as may issue, under the authority of this commonwealth, against any person or persons charged with crimes committed without the said tract of land, may be executed therein, in the same way and manner as though this consent had not been granted.
 
 
 62
 'Sec. 2. And be it further enacted, That if the agent or agents employed for the United States, and the owner or owners of said tract of land so to be purchased, cannot agree in the sale and purchase thereof, such agent or agents may apply to any court of general sessions of the peace which shall be holden within and for the aforesaid county of Middlesex; which court, after due notice given to the said owner or owners, are hereby empowered and directed to hear, and finally determine the value of the same tract of land, or any part or portion thereof, by a jury, under oath, to be summoned by a sheriff or his deputy for that purpose, or by a committee of three persons, if the parties aforesaid can agree upon them; and the value thereof being thus ascertained by the verdict of such jury, or the report of such committee, who are also to be under oath faithfully and impartially to value said tract of land, or any portion of the same; and such verdict or report being accepted and recorded by said court, and the amount thereof being paid or tendered to the owner or owners of said tract of land, or to the owner or owners of any part of said tract of land, that shall have been thus valued, with his or her reasonable costs; the said tract of land, or such parts of the same as shall be thus valued, shall forever be vested in the United States, and shall and may be by them taken, possessed, and appropriated to the purposes aforesaid.'
 
 
 63
 'Upon the trial and statement of facts in this cause, the following questions occurred, on which the opinions of the judges were opposed, and thereupon it was ordered by the court, on motion of William Minot, of counsel for the plaintiffs, that the points on which the disagreement happened should be certified to the Supreme Court for their decision.
 
 
 64
 '1. Whether the soil and freehold of the street called Henley or Meeting-house street, and of the street called Battery or Water street, did or did not pass to the United States, under and by virtue of the term appurtenances, used by the jury in their verdict in the description of the lot No. 2, or by the description in said verdict of lots No. 1 and 3, or by the proceedings by which the land was taken by the United States.
 
 
 65
 '2. Whether the limitations contained in said statute of October 30, 1781, is a bar to the plaintiffs' right to recover the soil and freehold of said streets.
 
 
 66
 '3. Whether, upon the discontinuance of a high way in Massachusetts by the public, the soil and freehold of such highway reverts to the owner of the land taken for such highway.
 
 
 67
 '4. And upon the facts stated, whether the plaintiffs have any right or title to the lands taken for streets, in which the trespass is supposed to have been committed, and can maintain their said action.'
 
 
 68
 The case was presented to the court on a printed argument, prepared by Mr. Minot, of Massachusetts: and was also argued at the bar by Mr. Reed, for the plaintiffs; and for the defendant, by Mr. Butler, attorney-general of the United States.
 
 
 69
 Upon the first point reserved: 'whether the soil and freehold of the street called Henley or Meeting-house street, and of the street called Battery or Water street, did or did not pass to the United States under and by virtue of the term 'appurtenances,' used by the jury in their verdict in the description in the same, of lots No. 1 and No. 3, or by the proceedings by which the land was taken by the United States;' it was contended——
 
 
 70
 That the 2d section of the act of June 17, 1800, authorizing the purchase of the navy yard, provided, that if the United States, by their agent, and the owner of the land cannot agree, the land taken by the United States, shall be valued by a jury. John Harris did not agree that the land should be taken, and the transfer was made in invitum, and, therefore, Harris cannot be considered as having made a voluntary conveyance. Before Meeting-house street and Water street were laid out, all the land was owned by him from the lane leading to the brick yard to low-water mark. These streets were laid out before 1800, and the jury valued the lots which were separated by the streets in distinct parcels.
 
 
 71
 The verdict finds, that the jury were shown several lots of land, and that they had set out these lots by metes and bounds. If the United States meant to take the whole land of Harris, including what was covered by streets, it is not easy to conjecture why the jury should have valued it in separate lots; no advantage could result to either party from this valuation. The statute does not require that the land should be set out by metes and bounds; and all that could have been necessary was to describe the land, with reasonable certainty, so that it should appear that it was within the limits allowed for the purchase.
 
 
 72
 But, in fact, the jury did not take the whole of Mr. Harris's land; they left a small gore adjoining the lot No. 2, which his administrators sold to Commodore Hull, and which he sold to the United States; and this gore is now within the precincts of the navy yard.
 
 
 73
 It is inferred that the jury did not intend to include, and did not, in fact, include the soil and freehold of the streets as parts of the land taken and valued by them, from the following facts and reasons:
 
 
 74
 1. The jury describe the several lots as they were enclosed by fences running completely round them; and where they were bounded by streets, describing them as running on or by the streets, and thereby excluding the streets. In fact a map of the lots could not afford a more perfect or definite description than the jury give.
 
 
 75
 The only doubt which has been suggested, whether the streets are excluded, arises from the use of the word appurtenances in the description of the second lot. It was argued in the court below, that if the term appurtenances carried the two streets, on which the second lot was bounded, it would give all the streets of which said Harris owned the soil; but this is an error in fact.
 
 
 76
 Water or Battery street extends from the east end of lot No. 2, to a point marked B, on the southeast corner of lot No. 1, a distance of more than three hundred feet; and for that distance, it cannot be pretended that the soil of the street can be affected by any construction of the term 'appurtenances,' as used in the description of No. 2.
 
 
 77
 2. It appears, from the statement of facts, that there were buildings on lot No. 2, and no buildings on the other lot. This caused the jury to use the term appurtenances in reference to this lot, as, in common parlance, this term is often used to mean buildings. There is no technical nicety in any of the proceedings, and the agent of the United States did not employ counsel, nor was he a lawyer.
 
 
 78
 3. If the jury intended by 'appurtenances,' to include streets, why not use it as to other lots, some of which are entirely surrounded by streets, and particularly lot No. 1. These streets are of equal importance to the navy yard.
 
 
 79
 4. There is no award of the value of the streets, and as the owner of the ground did not voluntarily submit to the proceeding, all that was taken should have been valued.
 
 
 80
 5. On the north side of lot No. 1 there is a road leading to the brick yard; this is one of the roads discontinued by the town. In 1801 the town sold the road to Aaron Putnam, in consideration of his agreeing to make a new road in another place.
 
 
 81
 The ground covered by the road conveyed by the town was, by the grantee, afterwards sold to the United States in 1801. The purchaser from the town was the agent of the United States, thus showing they did not consider the soil of the streets as taken by the jury.
 
 
 82
 6. When the United States took the land from Harris, the streets were public highways, and the soil was of little value to Harris to sell, encumbered as it was with the easement; nor could he make any valuable use of it, until the easement was discontinued.
 
 
 83
 7. The protest of Harris, made in public town meeting, is evidence that he did not believe the soil of the streets had been set off by the jury; and that he considered himself as possessing an interest of some value in the streets.
 
 
 84
 It was contended by the defendant, at the trial, that in the construction of devises, though lands will not pass under the term 'appurtenances,' taken in its strict technical sense; yet they will pass if it appeals that a larger sense was inteded to be given to it.
 
 
 85
 But the authority of the maxim that land cannot be appurtenant to land, is not impaired by late authorities. It is recognised in Leonard v. White, 7 Mass. R. 6. Doane v. Broadstreet Corp. 6 Mass. R. 332.
 
 
 86
 It must be a very manifest intention of the testator, to be drawn from the will itself, which will induce the court to take the word appurtenances in its larger sense. Several authorities on this point are collected in a note to Smith and al. v. Martin, 2 Saund. 400.
 
 
 87
 In Leonard v. White, 7 Mass. R. 6, it is decided that a deed conveying a lot of land with a mill on it, 'with the privileges and appurtenances thereto belonging,' did not pass the soil of a way leading from the road to the mill, though the easement might pass as appurtenant to the land conveyed.
 
 
 88
 Jackson v. Hathaway, 15 John. R. 447. Where a person, over whose land a highway is laid, sells the land on each side of the highway, by such a description as does not include the road any part of it, the soil of the highway does not pass to the grantee; as it is excluded by the description of the land granted, and cannot pass as an incident, though the deed contained the usual sweeping clause of all right, title, interest, &c.
 
 
 89
 In Tyler v. Hammond, 1 Pickering 193, the defendant held a lot of ground, granted with an exact description of all the boundary lines. The deed contained a sweeping clause, under which the defendant claimed the soil in the adjoining highway; but the court held that the particular description controlled the sweeping clause in the deed, and that the highway did not pass as an incident or appurtenant.
 
 
 90
 Second point: 'Whether the limitation contained in the statute of October 30, 1781, is a bar to the plaintiffs' right to recover the soil and freehold of said streets.'
 
 
 91
 Upon this point, it was contended that the legislature meant to conform, as nearly as possible, to the existing statutes relative to highways, and to provide an equitable contribution from the property not taken for the highways, in consequence of the benefits derived from them.
 
 
 92
 The preamble states the destruction of the town by the events of the war; and in 1780, an effort was made to recover it, and to lay it out in regular streets, and enable the inhabitants to rebuild their houses on a uniform plan.
 
 
 93
 The committee was appointed by the town of Charlestown, and, under the laws of Massachusetts, they had no right to lay out streets; that power being in the selectmen, or persons acting under their authority, subject to the ratification of the inhabitants in town meeting.
 
 
 94
 The proceedings of the committee could not take away the rights of soil in any one, and the limitation of their power was the inducement to apply to the legislature for the act to confirm their proceedings. That act did no more to give the same validity to the proceedings of the committee than to make them equivalent to the proceedings under the highway statute. It was no advantage to the town to have the fee in the lands over which streets were laid out; and it cannot be supposed that it was intended to give the town of Charlestown more than the highway laws give to any other town in the commonwealth. By the provisions of the highway laws, when land is regularly taken for a highway, no action for possession or for damages can be maintained. Such only was the operation of the special act.
 
 
 95
 The preamble to the 4th section is in the same language of the highway statutes. 'Damages for laying out,' &c. is not descriptive of the loss of the freehold. It is used to express the value of the easement taken by the public.
 
 
 96
 The common law, which preserves the freehold of a road to the owner of the land, was early adopted in Massachusetts, and it is not easy to conjecture why the law should be altered in this particular instance; a single instance since the settlement of the colony; or why such an alteration should be desired.
 
 
 97
 But the plaintiffs insist that the defendant's construction of the act of 1801 cannot be correct, because such an operation of the act would infringe the constitution of the state of Massachusetts, which provides, (10th section of the declaration of rights) 'that whenever the public exigencies require that the property of any individual should be appropriated to public uses, he shall receive a reasonable compensation therefor.'
 
 
 98
 Public exigencies require that highways shall be laid out, and a reasonable compensation for the land taken for them is provided by a series of statutes. But it is only a public exigency which justifies such an appropriation of private property, and no such exigency existed in this case. The appropriation of the freehold of a road to the public was wholly unnecessary and totally worthless. It is true that the statute provides a compensation in this case, but from the language used 'damages for taking' being the same as used in highway statutes, it may be inferred that the legislature intended damages for the easement only. It cannot be presumed that the legislature intended unnecessarily to violate private property, or to depart from the usual course of legislation on similar subjects; and in the absence of any manifest intention in the statute itself, to take the freehold of the streets, as well as from the uselessness to the town of such a proceeding, it is manifest that the legislature have adhered to the usual course of legislation on the subject of highways, and have given to the town all that it was needful for it to possess, without unnecessarily violating the property of an individual.
 
 
 99
 It may be said that John Harris has given validity to an illegal act by accepting a compensation.
 
 
 100
 The reply is, that he had a right to compensation for the easement; that what he received was accepted by him for the value of the easement; and this is apparent from his protest at the surrender of the streets to the navy yard, 'on account of his right to the advantages of the streets.'
 
 
 101
 But it is doubted whether the laying out of Water or Battery street and Meeting-house street, is affected by the operation of this statute.
 
 
 102
 The language of the statute is retrospective. It confirms the past proceedings of the committee. It speaks of lands taken away by the plan. The streets in question were laid out up to the present line of the navy yard in 1781, but were not carried into the land now occupied by the navy yard, until 1796 and 1799, and the land now claimed by the heirs of John Harris was not taken from him till 1796 and 1799. The streets were not laid through the navy yard in 1781. There was no taking of Harris's land at that time, and there could be no damages before taking. The referees in 1796 speak of a street proposed to lead to the Meeting-house, 'but not yet opened.'
 
 
 103
 Can the statute of 1781, confirming past proceedings, bar an action for an act done in 1796? Harris had sustained no damage in 1781. Nothing was taken from him; he had the vesture and herbage and all other profits of the land till 1796.
 
 
 104
 It will be seen by reference to the statement of facts that the town of Charlestown sold Back lane, one of the streets in the navy yard not laid out by the town's committee in 1781, and upon which that act could have no operation. From this fact it appears that the town considered itself vested with the whole property in the streets by the mere act of laying them out, and did not consider that property as derived from the act of 1781.
 
 
 105
 On the third point: 'Whether, upon the discontinuance of a highway by the public, in Massachusetts, the soil and freehold of such highway reverts to the owner of the land taken for such highway,' it was argued: that, it is the settled law of Massachusetts, that by the location of a way over the land of any person, the public acquire an easement; but the soil and freehold remain in the owner, although encumbered with a way, and if the way be discontinued, he shall hold the land free from the encumbrance. This position is fully sustained by the decisions of the supreme court of Massachusetts, in Commonwealth v. Peters, 2 Mass. R. 127. Fairfield v. Williams and al. 4 Mass. 427. Perley v. Chandler, 6 Mass. 454. Alden v. Murdock, 13, 259. Stackpole v. Henley, 16 Mass. 33. Robbins v. Bowman and al. 18 Mass. 122.
 
 
 106
 The plaintiff's counsel also referred to the opinion of Mr. Justice Story in the case of the United States v. Richard D. Harris, circuit court Massachusetts, October term 1830. Reported in 1 Sumner's Reports.
 
 
 107
 Mr. Reed for the plaintiffs.
 
 
 108
 By the inquest it appears——
 
 
 109
 1. That five lots or parcels of land were appraised and taken by the United States.
 
 
 110
 2. That each lot was measured and particularly bounded.
 
 
 111
 3. That the lots were bounded as abutting the streets, and by the streets, (the very streets claimed in this action,) and ex vi termini excluding the streets.
 
 
 112
 It is contended, then, as a necessary inference, that the streets being the land claimed by the plaintiffs, and once the property of their ancestor John Harris, were not appropriated by the jury, were not set off by the jury, or paid for by the United States; and of course did not pass to the United States, but remained in the said John Harris.
 
 
 113
 But it is contended that the soil and freehold of the streets being the land now claimed, passed under and by virtue of the word appurtenances, used by the jury in the apprisal of one lot, No. 2.
 
 
 114
 There is no award of the value of the streets. The jury were bound to value all the land taken by the United States; and the United States were bound to pay for all the land they took; but it was not valued, or paid for, or taken.
 
 
 115
 The word appurtenant might have been used by accident or caution; or what is most probable, with a view of conveying three houses, as the statement of facts finds that there were three houses on lot No. 2, and no houses on the other lots. It is admitted the houses would have passed without the word; but the jury might have been ignorant of the law; or have chosen to make assurance doubly sure.
 
 
 116
 It is clear that there was no intention on the part of the jury to convey the streets; but at all events, the intention to convey the streets does not appear. The streets cannot pass by the word appurtenant.
 
 
 117
 The lot No 2 touches a part of the way only upon the two streets now claimed.
 
 
 118
 1. It is contended that it is a well-settled principle of law, that land cannot be appurtenant to land.
 
 
 119
 2. If there be exceptions to this principle, it is in cases where the intention of the parties is manifest, and where the court reject the legal and technical meaning to establish and effectuate the manifest intention.
 
 
 120
 If such construction is claimed, let it be clearly shown that such was the intent.
 
 
 121
 The reverse is the fact.
 
 
 122
 The other four lots taken were bounded by streets, and lot No. 1 was surrounded by streets, all a part now of the navy yard; why did they not use the word appurtenant?
 
 
 123
 Second point: In examining the statute of October 1780, it is very material to bear in mind the subject-matter about which they were legislating. The subject-matter was streets, lanes, squares, &c.
 
 
 124
 By the law of Massachusetts, town roads are laid out by a class of magistrates called selectmen. In the present case, the streets, lanes, &c. were laid out by a committee, and not by the legal authority. The laying out, therefore, needed legislative sanction and confirmation. Charlestown did not apply to the legislature because they wanted streets and lanes different from other towns, nor the fee in the streets; but because they wanted streets, &c. laid out by a committee, and not by the authorized magistrates the selectmen.
 
 
 125
 By the act referred to, of 1780, the easement or privilege of highways alone passed.
 
 
 126
 1. Why did the town desire the fee? No man had foresight to look forward to the time when it might be of use. No other town had such fee in a road; and it appears by the very act referred to, that one-half their taxes were relinquished by the state to enable them to pay for the roads, and surely under such circumstances they could not desire to buy, nor would the state consent to aid them in purchasing what they did not need, and what other towns did not possess.
 
 
 127
 Another argument not to be overlooked is, that it is a principle of law that special acts in derogation of private rights should be construed strictly. Harris parted with no portion of his land voluntarily; let it then be clearly shown it was taken by force of law. His land cannot legally be taken by doubtful construction.
 
 
 128
 The most material point and argument, and which is considered unanswerable, is the objection arising from the constitution of Massachusetts.
 
 
 129
 By the 10th section of the declaration of rights, it is provided, 'that whenever the public exigencies require that the property of any individual should be appropriated to public uses, he shall receive a reasonable compensation therefor.'
 
 
 130
 It is contended in the case on trial that the fee of the land was taken. But the legislature had no authority to take it unless the public exigencies required it. It is manifest the public exigencies did not require it; the easement was required, and not the fee; and, therefore, the legislature cannot be presumed to act in violation of the constitution, and if they did so act, their acts are void and not binding.
 
 
 131
 The act of 1780, then, granted the easement and not the fee; and the first section of the act barring all actions for recovering possession of any land lying within any of the streets, lanes, squares, &c., was intended to apply to the use, the easement; and was intended to be in force so long as those lanes, ways, and squares were used for the purposes for which they were laid out, and no longer.
 
 
 132
 Again: It is contended that the act of 1780, above referred to, confirmed and legalized the laying out of lanes, streets, &c., agreeably to a plan laid before the court. The streets being the land now in controversy, were not in fact laid out until 1796 and 1799; and, therefore, no plan of such streets could have been laid before the legislature in 1780. What is a plan, or chart, or map, but a picture of something real? The streets in question were not laid out previous to the law, and were not confirmed by the law.
 
 
 133
 Upon the third point, the printed argument and the authorities cited were referred to.
 
 
 134
 Mr. Butler, attorney-general, for the defendant.
 
 
 135
 Upon the first point presented by the counsel for the plaintiff, it is admitted, that the title of the plaintiffs to the freehold, and to the soil covered by the streets, did not pass to the town of Charlestown, or to the United States, holding under the proceedings instituted to obtain the ground used for a navy yard. But, in order to recover in this action, it is necessary that the plaintiffs should show a right to enter on the land, and to possess the same. If the United States acquired a right to use the ground as a navy yard, no such right existed; and it is contended that such a use is entirely consistent with the purposes for which the appropriation of the ground to public purposes was made. The United States entered and held under the town of Charlestown; and unless the plaintiffs could recover the soil and possession from the town, no recovery can be had from the defendant.
 
 
 136
 In the act under which the navy yard was established, and the ground taken, there is an express provision, that if at any time the navy yard shall be abandoned, the streets interrupted, and thus temporarily closed, shall be re-established. There is therefore a remaining and subsisting right in the town of Charlestown to the streets; which may be in full operation and effect at a future time. The claim of the plaintiffs is to the absolute and present ownership of the ground; and this is altogether inconsistent with the actual state of things, and the rights which rest upon the theme.
 
 
 137
 The use of the soil on which the streets were laid, is not inconsistent with the rights acquired by the United States. There may be an easement as to the soil, as well as in the surface of the land. This exists in a right of way, as the right implies the privilege to use part of the soil for making and repairing the road—so, too, the right to dig a canal—the right to make bricks, and to burn lime.
 
 
 138
 As to the plaintiffs' first point, that the use of the term 'appurtenances' did not carry with it the right to the soil of the streets, it is admitted. The decision of Mr. Justice Story, referred to by the counsel for the plaintiffs, (1 Sumner's Reports,) establishes this. This is also shown by the application of the United States to the town of Charlestown to use the streets for the navy yard; which was contemporaneous with the proceedings to obtain the land of Harris.
 
 
 139
 It is also admitted that it is the settled law of Massachusetts that the right of soil reverts to the owner, if a way is discontinued. This is in harmony with the rule of the common law. But it is denied that, in this case, there has been such a discontinuance and abandonment of the right of way, as to operate to its extinguishment or surrender.
 
 
 140
 The United States have a right to the possession of the streets, and to use the soil for the purposes of a navy yard; and of crecting on the same all the buildings required for the same. This right is derived from the act of 1781. By that act the soil of the streets was taken for public uses. The establishment of a town, and the purposes of the safety and convenience of the inhabitants, were in the views of those who appropriated the same for streets. The uses of the streets for a navy yard, and buildings connected with it, were among those for which the streets were laid out and the ground taken.
 
 
 141
 It is denied that laws such as this shall be construed strictly. The appropriation made of the streets and the soil on which they were laid out, was one of great public interest. A law which authorizes such an appropriation should have a liberal construction. Such laws are not in derogalion of private rights. They effect private rights, but when they operate a great public good, they are not to be confined in their application. This has been decided in New York, in cases where the lands of private persons were taken for the canals of that state. 20 Johns. Rep. 735; 7 Johns. Chan. Rep. 315, 328, 330. These cases show that where acts are passed eminently for the public good, they are to be liberally construed.
 
 
 142
 As the object of the law of 1781 was to allow the ground to be taken for public uses generally, some of those uses are not defined, but they are included in the word '&c.' These words include all that is claimed. They are inserted in the general provision of the statute, and they are also included in the recital in the 4th section of the act.
 
 
 143
 The argument of the plaintiffs is that the law only authorized the taking the land for streets; but the '&c.' gave more powers, and included other objects, Lord Coke assigns to these words a significant extension, and a powerful meaning. If the words '&c.' had been carried out, the law would have said 'for other like purposes.' The words '&c.' are equivalent to 'other like purposes.'
 
 
 144
 Taking the land for public purposes, gave to those who took it the right to use it for the great and important purpose of a navy yard. This is a defense of the whole town of Charlestown; and therefore of great public benefit. Could not the town of Charlestown have crected defences the streets? Market houses and court houses are often erected on streets; and this is done under a liberal construction of the legislative acts. The erection of a navy yard is fully authorized by this view of the law.
 
 
 145
 Under the fourth reserved point, it is contended that the soil of those streets was dedicated by the ancestor of the plaintiffs to public uses. From 1801 to 1814 there was an acquiescence in the appropriation made of the ground by the United States, for a navy yard. Why did not Harris take immediate measures to repossess the land as soon as the navy yard closed them. From 1801 to 1814 he was alive, during which they were so used.
 
 
 146
 Harris protested to the town of Charlestown, but not to the United States. This was a dedication to public uses of the land—an individual may make such a dedication. 6 Peters, 431.
 
 
 147
 Mr. Justice THOMPSON delivered the opinion of the Court.
 
 
 148
 This is an action of trespass, and the declaration contains two counts. In the first count the locus in quo is described as a certain close situated in the town of Charlestown, measuring four hundred feet in length and forty feet in width, formerly called Henley street: and in the second count, the locus in quo is described as a close in the same town, measuring seven hundred and fifty feet in length and forty feet in width, formerly called Battery or Water street. And upon the trial of the cause, the following questions occurred, upon which the opinions of the judges were opposed, and the points have been certified to this court, viz:
 
 
 149
 1. Whether the soil and freehold of the street called Henley or Meeting-house street, and of the street called Battery or Water street, did or did not pass to the United States, under and by virtue of the term appurtenances, used by the jury in their verdict, in desciption of lot No. 2, or by the description in said verdict of lots Nos. 1 and 3, or by the proceedings by which the land was taken by the United States.
 
 
 150
 2. Whether the limitations contained in the said statute of October 30, 1781, is a bar to the plaintiffs' right to recover the soil and freehold of said streets.
 
 
 151
 3. Whether, upon the discontinuance of a highway in Massachusetts, by the public; the soil and freehold of of such highway reverts to the owner of the land taken for such highway.
 
 
 152
 4. And upon the facts above stated, whether the plaintiffs have any right or title to the land taken for said streets on which the trespass is supposed to have been committed.
 
 
 153
 It appears from the statement of facts in the case, that in the year 1780, a committee, appointed by the town of Charlestown, projected certain streets in the town, and laid them down on a plan or map, which was deposited and now remains in the office of the secretary of state of the commonwealth of Massachusetts: and that on the 30th of October 1781, the legislature of that state passed an act confirming the doings of that committee, and barring actions in certain cases therein specified. John Harris, the ancestor of the plaintiffs, about the year 1793, became the purchaser and owner of certain tracts of land, which comprised the two parcels described in the declaration, and which are parts of the land through which said streets are laid down on the said plan or map, in the year 1780; although, in point of fact, Battery or Water street was not laid out and opened until the year 1795 or '6, and Henley or Meeting-house street not until the year 1798 or '9. These streets passed over the land of John Harris, and he received from the town of Charlestown a compensation in damages for taking the land belonging to him for the streets. In the year 1800, the government of the United States, under the authority of an act of the legislature of Massachusetts, purchased of John Harris several parcels of land now included within the limits of the navy yard, in the town of Charlestown; and in the year 1801, by an arrangement between the town of Charlestown and the United States, these streets, so far as they were within the limits of the navy yard, were closed up, and have ever since been discontinued, and ceased to be used as public highways; and have been used as a part of the navy yard. The act of the legislature of Massachusetts consenting to the purchase, and ceding the jurisdiction, provides, that if the agent of the United States, and the owners of the land so to be purchased, cannot agree in the sale and purchase thereof, application may be made to any court of general sessions of the peace of the county of Middlesex, which court is authorized to summon a jury to value the same. The agent of the United States and John Harris, not agreeing as to the value of the land so taken by the United States, the same was ascertained by a jury duly summoned according to the provisions of the act; and by the proceedings of the jury for that purpose, and the return made thereupon, five lots of land were appraised, which belonged to John Harris, which are particularly described by metes and bounds, and some parts of the land so appraised, is bounded upon and by the said streets; but no part of the locus in quo in either count in the declaration, is included within such bounds and description. The description of one of the lots so taken and appraised, begins as follows: 'One other lot of land, with the appurtenances, containing one-half of an acre, bounded as follows, &c., particularly describing the lot, but not including the highway; and one of the questions arising under the first point is, whether, under the term appurtenances, the soil and freehold of the street passed to the United States. This term is not used in the description of either of the other lots. The inquest of the jury, after particularly describing by metes and bounds, each lot, concludes in each case, as follows: 'Which same tract of land, on our oaths, we appraise and value at _____,' and the act of the legislature of Massachusetts declares, that such parts of the land so valued and paid for by the United States, shall be forever vested in the United States, and shall and may be taken possession of and appropriated to the purposes aforesaid. This inquest, therefore, shows that the jury appraised the land, only included within the description; and the act only vests the title to such land as shall be appraised. The streets were clearly not appraised, and so did not pass to the United States; unless they passed as an incident under the term appurtenances. If, from the use of this term, connected with and explained by the other parts of the inquest, it clearly appeared to have been the intention of the jury to include the streets; it might be considered a part of, and explanatory of the description, and be carrying into effect the intention of the jury. But if no such conclusion can be drawn, the term must receive its legal and appropriate interpretation. There is no ambiguity in the description of the lot, necessary to be explained; and it is difficult to conjecture what could have been the understanding of the draughtsman by the use of the term. It is not introduced in the description of any of the other lots. It does, to be sure, appear that there was upon this lot several houses, and none upon any of the other lots: and it is not unlikely that it was intended to apply to the buildings upon the lot; but this was unnecessary, as they would pass with the land: although, from the facts as disclosed in the case, we cannot discover any appropriate application of the term, yet we cannot undertake to say that there was not any right or interest incident to this lot, which would pass under the term appurtences. But there is no ground to warrant a construction, that it was used in reference to the soil and freehold of the street, or any thing to take it out of the strict, legal, and technical interpretation of the term. This term, both in common parlance and in legal acceptation, is used to signify something appertaining to another thing as principal, and which passes as an incident to the principal thing. Lord Coke says (Coke Lit. 121, b.) a thing corporeal cannot properly be appurtenant to a thing corporeal, nor a thing incorporeal to a thing incorporeal. According to this rule, land cannot be appurtenant to land. In the case of Jackson v. Hathaway, (15 Johns. 454), the court say it is impossible to protect the defendant on the ground that the adjoining road passed by the deed, as an incident to the lands professedly granted. A mere easement may, without express words, pass as an incident to the principal object of the grant; but it would be absurd to allow the fee of one piece of land, not mentioned in the deed, to pass as appurtenant to another distinct parcel, which is expressly granted by precise and definite boundaries. And in the case of Leonard v. White (7 Mass. Rep. 6,) it was decided, that by the grant of a grist mill, with the appurtenances, the soil of a way, immemorially used for the purpose of access to the mill, did not pass; although it might be considered as a grant of the easement for the accommodation of the mill. (Cro. Eliz. 704. Cro Char. 57. 3 Salk. 40.) The answer, therefore, to this branch of the question, must be that the soil and freehold of the streets did not pass under and by virtue of the term appurtenances, nor is there any thing in the description of lots Nos. 1 and 3, in the verdict of the jury, nor in the proceedings by which the land was taken by the United States, from which it can be inferred that the soil and freehold of the streets passed to the United States. It has been shown by the notice already taken of the verdict and proceedings, that they do not include the streets. The same answer must, therefore, be given to this branch of the question.
 
 
 154
 2. That part of the act of the 30th October 1781, under which the second question arises, is as follows: [Section 1.] 'That the said proceedings of the committee be, and hereby are confirmed, and all actions that shall be brought for recovering possession of any land lying within any of the streets, lanes, squares, &c., laid out as aforesrid, or for damages sustained or occasioned thereby, shall be utterly and forever barred.' The preamble to this act refers to the destruction of Charlestown by fire, and that a committee had been appointed by the town for regulating the streets, lanes, and squares in that part of the town which had been laid waste by the fire; and that the committee had proceeded to lay out the same, a plan of which had been deposited in the secretary's office. This preamble states that the committee was appointed to regulate the streets, which might not perhaps, in strictness, authorize them to alter the streets; but the act, in several parts of it, evidently looks to and provides for cases where the streets were widened and altered. This mode of laying out streets was not according to the general law of Massachusetts, and the object of the act was to legalize and confirm the proceedings of the committee, and to bar all actions to recover possession of any land so taken for streets, lanes, squares, &c., or for damages sustained by any one thereby. This bar of all actions, was to protect and establish the doings of the committee in laying out the streets; but does not seem to look to any question relating to the soil and freehold of the streets, if the easement should at any time thereafter be discontinued. This question is not stated with precision, and might, perhaps, admit of a more general view of the act of 1781, and open the inquiry whether the right of the plaintiffs to the soil and freehold of the streets was not taken away by it; but as the cause must go back for further proceedings, we do not think proper to enter into the more general consideration of this act, or touch the question as to its effect upon the plaintiffs' right to the soil and freehold of the streets. But only decide that such right, if it exists, is not barred by the first section of the act.
 
 
 155
 3. Upon the third point, the law in Massachusetts is well settled, that where a mere easement is taken for a public highway, the soil and freehold remains in the owner of the land, encumbered only with the easement, and that upon the discontinuance of the highway, the soil and freehold revert to the owner of the land (4 Mass. Rep. 427, 6 Id. 454, 13 Id. 259, 16 Id. 33.)
 
 
 156
 4. The fourth question is too general, embracing the merits of the whole case, and does not present any single point or question; and it has been repeatedly ruled in this court, that the whole case cannot be brought here, under the act of 1802, upon such a general question. This act provides only for bringing up in this manner specific questions, upon which the judges in the circuit court may be opposed in opinion.
 
 
 157
 Several questions growing out of the facts in this case have been suggested at the bar deserving consideration; but they are not stated in such specific points as is required by the settled course of the court, and no opinion will of course be expressed upon them.
 
 
 158
 This cause came on to be heard on the transcript of the record from the circuit court of the United States for the district of Massachusetts, and on the points and questions on which the judges of the said circuit court were opposed in opinion, and which were certified to this court for its opinion agreeably to the act of Congress in such case made and provided, and was argued by counsel. On consideration whereof, it is the opinon of this Court, on the first question so certified as aforesaid, that the soil and freehold of Henley or Meeting-house street, and of Battery or Water street, did not pass under and by virtue of the term appurtenances, used by the jury in their verdict, nor was there any thing in the description of lots one and three in the verdict of the jury that passed the soil and freehold of the said streets to the United States.
 
 
 159
 2. On the second point, it is the opinion of this Court, that the right of the plaintiffs to recover the soil and freehold of the said streets is not barred by the limitations contained in the statute of October 30, 1781, as set forth in the record.
 
 
 160
 3. On the third point, it is the opinion of this Court, that upon the discontinuance of a highway in Massachusetts by the public, the soil and freehold of such highway revert to the owner of the land taken for such highway.
 
 
 161
 4. On the fourth question, no specific point being stated, this Court can express no opinion, as it has been repeatedly ruled in this Court, that the whole case cannot be brought here under the act of Congress of 1802, upon such a general question. Whereupon it is ordered, and adjudged, by this Court, that it be so certified to the said circuit court.