HENRY PARKER & others *vs.* INHABITANTS OF FRAMINGHAM.

When the officer, who presides at the trial, by a sheriff's jury, of a question of damages alleged to be caused by the laying out of a road, reports the evidence, and certifies to the court of common pleas, with the verdict, the decision or direction given by him to the jury, such report is a part of the record ; and an appeal lies, under *St.* 1840, c. 87, § 5, from the decision of that court accepting or setting aside the verdict.

A straight turnpike road, which twice crossed a circuitous county road, was laid out four rods wide, through the land of B., leaving a strip of his land between the turn pike and the county road : B. afterwards conveyed this strip to P., and house lots, on the other side of the turnpike, to C and others, bounding each of them, on one side, "by the turnpike road." P. erected a building on the strip thus conveyed to him, and after he had occupied it more than thirty years, the turn pike road was discontinued : Thereupon a town way was laid out, two rods wide, over a part of the land formerly within the limits of the turnpike road, and within seven feet of the line thereof next to P.'s strip, and P. made a claim on the town for damages alleged to be thereby sustained by him. *Held*, that B.'s deed to P. did not convey any part of the land within the limits of the turnpike road, and that P. was not entitled to damages.

Individuals acquire no right of possession, adverse to the owner of the soil, by long use of that part of a public road which is not occupied as a travelled path.

THIS was a proceeding upon a petition for a jury to assess the damages sustained by the petitioners, in consequence of the laying out of a town way. The county commissioners issued a

warrant for a jury, and directed it to the sheriff, who caused a jury to be empannelled. "On the hearing before the jury, the following facts were proved or admitted: The land taken for said town way was formerly a part of the Worcester Turnpike, which was laid out in 1808, and was discontinued by the legislature in September 1841. Said turnpike was laid out four rods in width, passing through the village in Framingham, over the northern declivity of a hill, crossing and recrossing the county road, leaving a strip of land, on the north side, between it and the county road, which is from eight to ten rods wide in the middle, and terminating in a point at each end. There were then no buildings on either side of said turnpike. Thomas Buckminster was seized in fee of the land taken for the turnpike, and also of the land on both sides, to wit, the hill on the south side, and the said strip of land on the north side; and he received his damages as assessed by a jury. About the year 1811, said Buckminster conveyed said strip of land to certain persons, and house lots on the opposite side to certain other persons, describing the land in all cases as bounded by the Worcester Turnpike. At the time of said discontinuance, and also at the time of said laying out of said town way, William K. Phipps and others were severally seized in fee of said house lots, by intermediate conveyances from said Buckminster, (the premises in each deed being bounded northerly on the Worcester Turnpike,) and had erected dwelling-houses on their lots, more than thirty years before said discontinuance. At the times of said discontinuance and laying out, the petitioners were seized in fee, as tenants in common, and in the proportions alleged in their petition, of about twelve rods in length of the east end of said strip of land, by intermediate conveyances from said Buckminster, (bounded on the south side by said turnpike, in all the deeds,) and more than thirty years before said discontinuance, had erected a two story coach and chaise manufactory building, on the western extremity of said lot, the remainder of it lying open to the east, affording access to the lower story. On the west, the building adjoins a house of I. S. Wheeler, and is so near the road on the north, and so elevated above it, as to afford

but little convenience on that side.   On the east end of the
building, and on a level with the upper story, is a platform,
about fourteen feet in width, and the length of the building on
the south side is about fifty two feet ; the whole, on that side,
being about sixty six feet in length.   The upper story and plat-
form are accessible only on the south side.   The petitioners
claimed the north half of the turnpike, lying contiguous to their
said lot ; and it appeared that said town way was laid out over
the same, being about two rods in width, bounded northerly
within about seven feet of the northern line of the turnpike,
within about sixteen feet of the manufactory at its west end,
and within about seven feet at the east end.   The petitioners
claimed damages only for the part taken for the road, which lies
south of said building and platform.

   " It appeared that only a small part, say about seven feet, of
the remainder of said turnpike on the south side, had ever been
put in a passable condition, and appropriated, by the turnpike
corporation, for the purposes of the turnpike.   It did not appear
that the owners on either side had ever been interrupted by
said Buckminster, or his heirs, or by any other person, in the
use and enjoyment of their own side of the turnpike, so far as
the same could be used without detriment to the public travel ;
nor that any person had ever made claim of title thereto.   Nor
did it appear that said Phipps, or any of said owners, on either
side, had ever claimed a right to travel over the turnpike, or
over said strip of land at the east of said manufactory.   But it
was admitted that they always had so travelled, like others who
chose to do so.   It was admitted that neither said Buckminster,
nor his heirs, nor any other person, had made application in the
premises, for a jury to assess damages.   It was also admitted
that said town way had been duly laid out and recorded.

   " The counsel for the respondents contended that the unin-
terrupted use of said turnpike, for more than twenty years
before its discontinuance, by said Phipps and other persons,
gave them a right of way, as against the turnpike corpora-
tion, by prescription, which could not be defeated by its dis-
continuance ; and that, as against the said Buckminster, his

heirs and assigns, they had also gained the same right of way, by virtue of the deed of the said Buckminster, and the intermediate conveyances under which they derive their title; inasmuch as the said Buckminster was, at the time of the laying out of the turnpike, the owner of the land between the premises and the county road, and so a way, as of necessity, was granted by implication; and that these persons have a right of way, so that when said turnpike was discontinued, it could not be shut up against them.

"The respondents contended that the deed of the petitioners, which bounds them by the Worcester Turnpike, gave them no title to the land for the taking of which they claimed damages, and requested the sheriff so to instruct the jury; but he instructed the jury otherwise, on both points."

The jury assessed damages for the petitioners, and the sheriff returned the verdict to the court of common pleas, and, at the request of the respondents, certified therewith his instructions to the jury. That court set the verdict aside, and the petitioners thereupon appealed to this court.

*Josiah Adams,* for the appellants.

*Train,* for the appellees.

SHAW, C. J. A preliminary question was made, whether this case rightly comes before this court by appeal, it being a judgment of the court of common pleas, setting aside the verdict of a sheriff's jury, by which damages had been awarded to the complainants, on laying out a town way. The court are of opinion that this was a judgment of the court of common pleas, founded on matter of law apparent on the record, and therefore that it is within the provision of *St.* 1840, *c.* 87, § 5, allowing an appeal. It is not within the spirit or meaning of § 4, prohibiting an appeal from a judgment of the court of common pleas upon the verdict of a jury. That plainly applies to common law cases tried by jury in the court of common pleas, where the effect of an appeal would be, to annul the verdict, as of course, and open the case to a jury trial in this court.

It was further contended that the court could not take notice of the decisions given by the sheriff upon points of law, on the

trial before him, because they appear only by his report, and
such report is no part of the record ; and the counsel relied on
the cases of *Coolidge* v. *Inglee*, 13 Mass. 50, and *M'Fadden* v.
*Otis*, 6 Mass. 323.    But the case at bar is wholly distinguish-
able.    Those were the ordinary cases of an action tried in this
court, at *nisi prius*, where the judge, on the motion of either
party, consents to reserve a question for the consideration of the
whole court, and, to enable them to understand it, makes a report
of so much of the case, as to show the application of the decis-
ion to the case.    The report in such case is wholly distinguish-
able from a bill of exceptions, which, when duly tendered and
allowed, becomes part of the record, and of which the purpose
is, to place matter upon the record which would not otherwise
appear there ; with a view, either to a writ of error, or to the
more summary mode of revision provided by statute.    But where
a judge at *nisi prius* consents to reserve a point, the report is a
mere authoritative communication by the judge to his fellows.
It might be, and sometimes is, made orally at the hearing ; but,
for the convenience of all parties, is more generally made in
writing.    There the report is no part of the record ; the result,
which is entered of record, is the granting or refusing of a motion
for a new trial, setting aside the verdict, or entering a judgment
upon it, as the case may be.    In one class of cases, it is true that
the court will order a nonsuit or default, amend or reverse a ver-
dict, and enter judgment definitively upon such nonsuit, default,
or altered verdict ; but, in all these cases, it is done by the consent
of the parties, given and noted when the case is so reserved ;
and the act of the court is warranted and justified by such con-
sent of parties.    But the case of the report of a sheriff, or of the
officer appointed to preside over the trial before a jury, is alto-
gether different; it is made *alio intuitu*, and with a different
legal effect.    It is provided for by the Rev. Sts. *c.* 24, § 25,
as follows:    " The person who shall preside at any such
trial " (having previously directed that such presiding officer
shall be the sheriff, or some person appointed for the purpose
by the county commissioners,) " shall decide all questions of
law arising on the trial, which would be proper for the decision

of a judge; and shall direct the jury upon any question of law, when requested by any party; and shall certify to the court, with the verdict, the substance of any decision or direction by him given, when any party shall request it." This statute gives such a report the character and effect of a bill of exceptions allowed. It is to be returned with the verdict. The obvious purpose is, to enable the court of common pleas to revise the decisions made by the sheriff in matter of law, and if erroneous, to set aside the verdict. In no other way could a party aggrieved by an erroneous decision have the benefit of the law of the land, to which he is entitled. But if the court of common pleas can rightfully act upon such report, who have authority to adjudicate upon the verdict and set it aside for any good cause, (one of which certainly would be, that it was founded upon legal decisions or instructions erroneous in matter of law,) *a fortiori* must this court, whose special province it is to revise the questions of law arising in the case, receive it and act on it, as part of the record.

Supposing the case rightly before us, the question is, whether the appellees, the original complainants, are entitled to damages, on the facts stated. The facts are briefly these: In 1808, the Worcester Turnpike was laid out, and, at the place in question, passed through the land of Thomas Buckminster, for whom damages were assessed, according to law, for the land taken. In 1811, Buckminster sold the land, in right of which the appellees now claim, lying on the northerly side of the Worcester Turnpike, and between that and an old highway, to persons through whom, by mesne conveyances, it has come to them; and about the same time, conveyed house lots, on the other side, (the south side of the Worcester Turnpike,) to various persons who subsequently erected houses on them, building on the turnpike. These parcels of land were described, in all these cases, as bounded "by the Worcester Turnpike." This turnpike, being four rods wide, was discontinued in 1841, and subsequently a town way was duly laid out, two rods wide, over a part of the same land which was formerly embraced within the limits of the turnpike; and it is upon this last act of laying out the town way that the

appellees claim damages.  It is therefore manifest that, if the appellees, by their conveyance, acquired no title in the fee of the soil under the turnpike, or if they did, but yet acquired it under such restrictions that it must be always kept open as a way, then they are not entitled to damages.

By the well established rule of law in this State, the taking of land for a highway, including turnpikes, did not divest the fee of the owner, but created a perpetual easement for the public ; so that, when the turnpike was discontinued, the fee remained in Buckminster, or his heirs or assigns.

Whether the conveyance of land bounding on a highway is to be presumed a conveyance of the soil under the way, to the centre line, if the grantor owns it, is a question which has been much discussed, and is one of some difficulty in some of its aspects.  When, for instance, an ancient way, the origin of which is not known, is discontinued, whether the adjacent owners shall be deemed owners to the middle of the way, when there is nothing else to determine their rights, may be a difficult question.  In the case of *Webber* v. *The Eastern Rail Road Co.* the question was started, but it was not considered necessary in that case to decide it.  It was however then suggested, that as the owner of land adjoining a highway may convey his adjoining land without the soil under the highway, or the soil under the highway without the adjacent land, or both together, if the soil under the highway does pass by a conveyance, it must be as parcel, and not as appurtenant.  It was considered, therefore, as a question of construction, depending upon the intent of the parties as expressed in the descriptive part of the deed, explained by all the other parts of the conveyance, and by the localities and subject matter to which it applies.  *Webber* v. *The Eastern Rail Road Co.* 2 Met. 151.

That where a conveyance is made of land bounding on a street, describing the land with its appurtenances, the land under the street, belonging to the same owner, did not pass, was held by the supreme court of the United States, in the case of *Harris* v. *Elliot,* 10 Pet. 25.  Indeed, if it were to be regarded in law as an appurtenance, it would pass by a grant of the

adjacent land, whether appurtenances were expressed or not. *Kent* v. *Waite,* 10 Pick. 138.   Considering the question as one of intent, depending upon the construction of the deed, the only point here open is, whether the terms, "bounded by the Worcester Turnpike," meant the external limit of the four rods appropriated as a turnpike, or the *filum via,* the middle of the way.   The turnpike had then been recently laid out by an exact description, recorded, and well known and understood.   The parties knew that the turnpike was liable to be discontinued, but both had an interest, in that event, in having the same space kept open for their own use as a way.   The grantor owned lots on the other side, fit for house lots, having no other means of access to them but the turnpike, or he had sold them under the name of the turnpike, with an implied grant of a right of way, four rods wide, and therefore had an interest in keeping the way open, in case of a discontinuance of the turnpike.   The court are of opinion, that under the circumstances, the bound north by the turnpike was a bound by the north side of the turnpike, and that the land under the turnpike did not pass. See *O'Linda* v. *Lothrop,* 21 Pick. 292.

But we are strongly inclined to the opinion, that if half of the soil of the turnpike did pass to the grantees, it was subject to a perpetual right of way for the other proprietors bounding on the same section of the turnpike, and therefore that they were not damnified by laying it out as a town way.   It is a settled rule, that when land is granted, described as bounding on a way, it is an implied covenant that there is such a way; that, so far as the grantor is concerned, it shall be continued; and that the grantee, his heirs and assigns, shall have the benefit of it.   *Parker* v. *Smith,* 17 Mass. 413.   It seems reasonable, and quite within the principle of equity on which this rule is founded, to apply it to the discontinuance of a highway; so that if a man should grant land bounding expressly on the side of a highway, if the grantor own the soil under the highway, and the highway, by competent authority, should be discontinued, such grantor could not so use the soil of the highway as to defeat his grantee's right of way, or render it substantially less beneficial.   Whether this

should be deemed to operate as an implied grant, or as an implied warranty, covenant, and estoppel, binding on the grantor and his heirs, is immaterial. The right itself would be inferred from that great principle of construction, that every grant and covenant shall be so construed as to secure to the grantee the benefits intended to be conferred by the grant; and that the grantor shall do nothing to defeat or essentially impair his grant.

This principle would enure to the benefit of the grantees, so far as to secure to them an easement, and an open right of way on the soil of the turnpike, after it was discontinued, as against Buckminster, their grantor, and his assigns; but their easement and right of way have not been interfered with, in laying out the town way. So we think the abutters on the turnpike acquired, as against Buckminster and his assigns, a right of way, to the extent of the limits of the turnpike as defined in its recorded location, and therefore that the appellees, had they established a title to the soil under the turnpike, would have taken it subject to a right of way over it; and therefore, that they were not substantially damnified by making it a town way.

It was intimated, in behalf of the appellees, that having long occupied a part of the soil of the turnpike, lying between their shop and the travelled part of the road, for laying materials, and other like uses, they had acquired a title by possession. But we think it very clear, that such occupation was permissive and not adverse, and therefore constituted no title by possession. It was not adverse to the owner of the soil; because, during the continuance of the turnpike, he had no right to the possession. It could be no disseizin of the turnpike proprietors, or of the public; for they had an easement only, and no seizin.

But further; it is common for farmers and mechanics, and other adjacent owners, to use part of the soil of the highways, turnpikes, and other public ways, especially where they are wide, and where the travelled path occupies a part only of the width. We think this is usually understood to be permissive, and liable at any time to be suppressed as a nuisance; and it

would be contrary to the truth of the case and the understand ing of the parties, as well as contrary to true policy and the rights of the public, to consider such use of the highway adverse.

The judgment of the court of common pleas, setting aside the verdict for damages for the appellants, is affirmed