*In re* UNION EL. R. CO.

*(Supreme Court, General Term, Second Department.  June 25, 1888.)*

1. HORSE AND STREET RAILROADS—CONSTRUCTION OF TRACK—PLANS BY COMMISSIONERS.
   The plans for the construction of the Union Elevated Railroad Company of Brooklyn, made by the commissioners appointed by the mayor under the rapid transit act, (Laws N. Y. 1875, c. 606,) sufficiently comply with the provision of said act that "the commissioners must decide upon the plan for the construction of the railway, with the necessary supports, turn-outs, switches, sidings, connections, landing places, stations, buildings, platforms, stairways, elevators, telegraph and signal devices upon the route and in the location determined by them," though such plans do not give the location of the columns, the grade of the road, or the position of the stations, signal devices, switches, or sidings. and though they give the company power to add a "necessary third track," and discretion as to two modes of placing its columns along two short streets; it being shown affirmatively that the commissioners, in the limited time given them by law in which to report, could not have made more specific plans.

2. SAME—ELEVATED RAILROAD—REPORT OF COMMISSIONERS—RES ADJUDICATA.
   The judgment of the supreme court confirming the report of its commissioners appointed under said rapid transit act, to the effect that a certain elevated railroad ought to be constructed and operated, is an adjudication which binds all abutting property holders in regard to the sufficiency of the plans and the legality of the organization of such railroad, since such proceedings are in the nature of a condemnation suit, and the abutting property holders have the right to appear therein, and attack the validity of the company's organization.

3. SAME—ELEVATED RAILROAD—ADOPTION OF PLANS.
   The general plan adopted for said road by the commissioners, being substantially the same as that of other elevated railroads organized under said rapid transit act, on which large sums of money have been expended, and which have been treated by the courts as valid corporations, its legality should not be considered as an open question.

4. SAME—LOCATION OF ROAD—STREET OCCUPIED BY OTHER COMPANIES.
   The provision of said rapid transit act which prohibits the commissioners from locating routes for elevated railroads over streets "already legally authorized for or occupied by an elevated or underground railroad," does not apply to streets claimed to be covered by the routes of other railroad companies, but in which no company has a complete title to build.

Appeal from special term, Kings county; CULLEN, Justice.

Petition by the Union Elevated Railroad Company of Brooklyn to acquire title to land for railway purposes along certain streets in the city of Brooklyn. The petition was contested by some of the property owners on such streets, and they appeal from a decree granting the prayer of the petition.   The New York rapid transit act (Laws 1875, c. 606, § 4) provides that "the commissioners must also meet and decide upon the plan or plans for the construction of the railway or railways, with the necessary supports, turn-outs, switches, sidings, connections, landing places, stations, buildings, platforms, stairways, elevators, telegraph and signal devices, or other requisite appliances, upon the route or routes and in the location determined by them."

*B. F. Tracy, Johnson & Lamb, William J. Gaynor, Theo. Burgmeyer,* and *Arthur Murphy,* for appellants.    *Wingate & Cullen, (George W. Wingate* and *George Hoadly,* of counsel,) for respondent.

PRATT, J.   The purpose of the law (chapter 606, Laws 1875) was to facilitate rapid transit in cities, and at the same time protect the interest of individuals.   Under this law, the mayor, upon a petition in proper form of 50 property owners, appointed a commission to determine the necessity of rapid transit, and perform all the other duties required of such a commission by that statute.   The facts show that this commission duly performed all the duties required by the act.  They determined that there was a necessity for an elevated railroad, and located its routes, and decided upon the plans for the construction thereof.   The plans adopted were substantially the same as those of all the elevated railroads organized under this act.   The legality and sufficiency of such plans had been litigated up to the court of appeals, and been

fully sustained. The corporation was duly formed, the capital fixed at one million of dollars, the stock subscribed for, and the necessary amount paid in in cash. The company afterwards, on the 16th of July, 1886, obtained the consent of the local authorities, and, being unable to obtain the consent of a majority of the property holders, applied to the general term of the supreme court for the appointment of a commission, as authorized by said statute. This commission, after hearing all persons interested, reported that all the routes ought to be constructed except one, and such report was duly confirmed by the general term. From such order of confirmation no appeal was ever taken. The company thereafter commenced the construction of its road, parts of which are completed, and are now in operation. The judge at special term held, as matter of fact, that the plans were the same as those of the New York and Gilbert and the Kings County Elevated Railroad Companies. This finding is fully sustained by the proof, and we fully concur with the decision below that, irrespective of the fact whether the plans are precisely the same, the plans made by the commissioners, and adopted by the respondent, were a sufficient compliance with the statute. It is to be observed that the charter of this company was not the work of promoters anxious to build a railroad, but that of public officers selected by the mayor of Brooklyn to determine what kind of rapid transit, if any, the city should have, and what kind of a charter was necessary to accomplish the desired result. The commission proposed the articles of association, and invited the public to subscribe; and, in reliance upon the validity of their acts, millions of dollars have been expended in building the road, and in investments in real estate in view of the rapid transit thus established. Other facts will be referred to hereafter.

The question in this case is not whether the plans contained in the articles of association prepared by the mayor's commissioners, who formed the Union Elevated Railroad Company, are defective, but whether they fail so entirely to comply with what the rapid transit act requires the commissioners to specify in the plan which they are to adopt as to make what they prepared no plan at all. The assertion that this is the case rests entirely upon the decision of the court of appeals in *Re Cable Co.*, 104 N. Y. 1, 10 N. E. Rep. 332. It is to be first observed, in regard to this case, that it was an appeal from an order of the general term of the supreme court in the city of New York refusing to confirm the report of commissioners appointed by said court to determine whether the railways described in the petition of said cable company ought to be constructed and operated. The decision of such a question on the part of the general term was held, in the case of *In re Railroad Co.*, 78 N. Y. 383, 82 N. Y. 95, to be discretionary. In supporting such discretion, the judge who wrote the opinion in the court of appeals might well use arguments against its construction which were not absolute requirements of the statute. Any valid objection to the construction of such a road was a legitimate argument to sustain the discretion of the general term in refusing to confirm the report, whether it was contained in the statute or not, but in this case we are bound to look to the statute alone to discover any infirmity sufficient to destroy its charter. But, conceding all that the appellant claims, the facts presented by the record in this proceeding are, however, so different from those in the *Cable Case* as to render the decision of the court of appeals in that case not applicable. In the *Cable Case* its plans gave the company the option of constructing an elevated or a surface road, in its discretion, while they prescribed that the road should be double track. They also gave authority to add as many other tracks and girders as the company saw fit, to make such additions to the structure as might be needed, and to erect either a railway spanning the street, or a road running over columns upon the line of the curb, (with authority to erect transverse girders between the columns to support additional tracks,) or with a row of columns on the curb, and a row in the roadway. Page 35. These extraordinary powers, and particularly the failure to define

the kind of road, were properly held by the court not to make the plan sufficiently specific to comply with the statute. They do not exist in the charter of the Union. It is required to build an elevated road. In all its lines, with the exception of Flatbush avenue and lower Broadway, (two short and unusually wide streets,) the track is required to span the streets. In these two, while a discretion is given as to two modes of placing the columns, no authority is given to add additional girders. The company is required to build over the roadway in all cases. The authority to add tracks is limited to a "necessary third track."

In regard to the other details referred to in the opinion in the *Cable Case,* and which are claimed to apply to the Union, it appears affirmatively, from the expert testimony in the present proceeding, (what did not appear in the *Cable Case,*) that, as a matter of fact, it was impossible for the Union commissioners to make their plans any more definite than they did. The law required them, within 60 days after their organization, to locate the routes they considered necessary, and within 30 days thereafter to decide upon the plans. They were laymen, possessing no technical knowledge in regard to railroad construction, and were not required by the statute to possess any. No funds were provided to enable them to employ engineers to make a survey, and without this survey it was impossible to determine the location of the columns, or the grade of the road, (upon which depended the establishment of stations,) or the position of the signal devices, switchings, sidings, and other appurtenances, which the appellants claim ought to have been located. In fact, it is proved that to have made this survey would have occupied several surveying parties six months; and, when the survey was obtained, it would have been necessary to have a further force to plat out the *data* obtained from it, and then to have made a second survey before the plan of the road could have been fixed with the precision which it is claimed was required. It also is proved that their action was still further complicated by the fact that at that time there were three other roads which had been previously organized under the rapid transit act, each of which might, if it obtained the consent of the local authorities and the property holders, and entered into possession of any of the routes before the Union did, obtain the right to occupy them. In particular the Kings County Elevated Railway Company claimed a right to construct in Fulton street, which was eventually sustained, and it thereafter actually constructed the road which is now in operation in that street. This made a material alteration in the operations of the Union, altering its grade, and requiring changes in its stations, etc., to be made. There was a further uncertainty connected with the construction of the terminus of the Brooklyn bridge, which is not yet settled. Many of the details claimed not to have been sufficiently specified were matters which it is not customary to fix, even in surface railroads, until the road is being completed, and which of necessity must depend upon the manner in which the road is to be operated. They must, therefore, of necessity be left to the discretion of the company to locate them and alter them as the exigencies of its business may require. We agree with the special term that the act does not require the commissioners to fix the location of the stations, any more than it does the switches and signal devices. If one is required to be located, all must be; and, if located, the company cannot change, in any way, their location or construction. This would prevent a company from erecting a new station in the outlying parts of Brooklyn when required by the growth of population. It would also prevent them from changing a switch or signal which might prove to be dangerous, or for which a better plan might be offered. Besides it was not possible to specify these details with the information which the commissioners had; and the law does not require impossibilities. It therefore follows that the commissioners did all that they could under these circumstances, and their decision in the resolution adopting the plans, "that they had fixed the details as far as in their

judgment the same was practicable," is sustained by the evidence, and should not be reviewed by the court. The general plan adopted by the commissioners was the same as that of the Kings County, the New York Elevated, the Gilbert, the Manhattan, the Long Island, the Brooklyn Rapid Transit, and in fact every elevated railroad which has been organized under the rapid transit act, at least so far as the particulars criticised by the appellants are concerned, and to sustain the objections made to the plans of the Union would require a decision that these companies were not legally incorporated. The method of procedure adopted by public officers, such as the sworn commissioners who formed these companies, is entitled to recognition by the court; and, even if it should be considered as erroneous if it came up as a new question, the courts will regard such action as conclusive where it has been generally followed, and where, as here, large amounts of money have been invested upon the faith of such a course of conduct.

We concur with the views expressed on the special term as to the effect of the decision in *Re Railroad Co.*, 70 N. Y. 327. The title of the company (which was in litigation in that case) to construct its road upon the plan adopted by the commissioners depended entirely upon whether the mayor's commissioners had formed "a plan" in accordance with the statute. Some of the very objections now made here were made in regard to this very plan, and consequently the decision affirming the right to build was necessarily an adjudication as to its sufficiency. The same was the case in regard to the decision in *Re Railroad Co.*, 105 N. Y. 97, 13 N. E. Rep. 18, the charter of which is almost identical with that of the Union, and was used as the model for its charter. This case was heard by the court of appeals before the argument in the *Cable Case*, and was decided after the decision in the latter. The court must, in so doing, necessarily have had in its mind the principles it had just laid down in its decision in the *Cable Case*. It is incredible that it would, if it considered the charter of the Kings County Elevated to have been void under the *Cable* decision, have upheld its validity, and thereby encouraged its stockholders to expend millions of dollars in the construction of the road, at the risk of losing it whenever the matter should again be brought before it on appeal. The roads of the Union and the Kings County were both organized to meet a public demand for rapid transit in Brooklyn. They are both now running, and upon the faith of them many buildings have been erected, and large investments of capital have been made in the purchase of lots and the building of houses. Anything which would declare them not to be corporations would stop their operation, and inflict so much injury upon property owners as to be a public calamity. In addition, the stockholders in these roads, who had nothing to do with their organization, and who, in the case of the Union, are proved to have invested over a million and a half dollars upon the faith of the legality of the action of the commissioners before their charter was attacked, are entitled to protection. It would be a most inequitable proceeding if the court were to deprive them of their money upon the grounds urged against the charter in this proceeding, (which are as technical as might be made to an indictment at common law,) which were unknown at the time of their organization.

We are further of the opinion that the judgment of this court, confirming the report of its commissioners that the Union Elevated Railroad ought to be constructed and operated, is an adjudication which binds all abutting property holders in regard to the sufficiency of its plans, and the legality of its organization. The *Cable Case* itself was a proceeding of this description, in which, upon the hearing before such commissioners, the abutting owners appeared, and objected to the sufficiency of the plans. The court of appeals, in its decision upon the application for reargument, held that they could do this, as the proceeding was in the nature of a condemnation to take from the abutting owners their consent, which was property, and that, therefore, they had the

same right to attack the validity of the organization of the corporation in it as they would have in an ordinary condemnation proceeding instituted against them by the company. It consequently follows that what abutting owners did in the *Cable Case* they could have done in the case of the Union when it was before the commissioners appointed by this court, or upon the application to the latter to confirm the commissioners' report that the road "ought to be constructed and operated." If they did not choose to do so, it still follows that they had "their day in court," and that the decision is as much an adjudication against them as if they had done so. It is certainly clear that if the court is to sit in review of the sufficiency of the plans adopted by the rapid transit commissioners, the company is entitled, in common justice, before it incurs the expense of actual construction, to an adjudication in a proceeding in which all persons interested may be made parties, to determine whether its organization is valid. The proceeding before the general term commissioners was had upon public notice, to which all persons interested were duly summoned, and offered an opportunity of being heard. All the appellants might have appeared in that proceeding, and litigated the corporate organization of the railway company, and its right to build its road, if they saw fit. Consequently the judgment of this court, confirming the report of the commissioners "that the road ought to be constructed and operated," established the right of the corporation as a legal organization to build their road, as against them, in all future litigations.

Neither do we think the fact that the commissioners located routes in streets claimed to be covered by routes of other railroad companies is fatal to this proceeding. The statute gives the commissioners exclusive power to locate routes over streets, "except such as are already legally authorized for or occupied by an elevated or under-ground railroad." No street can be said to be legally "authorized for" an elevated railroad until some company is vested with the right to build its road in such street. At the time these routes were located, no company had a complete title to build in any of the streets designated by the commissioners for the respondent company. The judge was undoubtedly right in holding that the clause in the report in regard to the occupation of streets by another railroad only referred to elevated railroads, and not the existing horse railroads, and was a necessary precaution in view of the claims of other elevated roads.

We have endeavored to answer every objection urged by the appellant having any foundation in fact, and are forced to the conclusion that the mayor's commissioners duly complied with the law; that similar charters have been sustained by the court of appeals; and that the decisions in the *Cable Case*, so called, is not in hostility to the charter of the respondent. The order must therefore be affirmed, with costs.