*In re* METROPOLITAN E. RY. CO.

*In re* NEW YORK E. R. CO.

(*Supreme Court, Special Term, New York County.* October, 1888.)

1. EMINENT DOMAIN—ELEVATED RAILROADS—PROCEDURE.

The New York Elevated R. Co., having by Laws N. Y. 1875, c. 595, acquired all the rights, powers, privileges, and franchises of the West Side & Yonkers P. R. Co., which it had purchased, and which by Laws 1866, c. 697, and Laws 1867, c. 489, was vested with all the powers relative to acquiring real estate, conferred upon railroad companies formed under the general railroad act, (Laws 1850, c. 140,) and acts amendatory thereof; and having subsequently, through the action of the rapid-transit commissioners, pursuant to Laws 1875, c. 606, § 36, acquired the right to construct and operate its East-Side lines, and become vested with the same power to condemn real estate for those purposes that it already had for the purposes of its West-Side lines; and the Metropolitan Elevated Ry. Co. having been granted all the rights and privileges, and made subject to all the provisions, of chapter 140, by Laws 1872, c. 885, except as modified by that act, such companies have all the powers, in regard to acquiring real estate for the purposes of their incorporations, which are

given by chapter 140, and the amendments thereof, to corporations formed under that law; and, in taking legal proceedings to acquire real estate, they may follow the mode of procedure prescribed in that chapter, and the amendments thereof.

2. SAME—PROCEDURE—APPLICATION FOR APPOINTMENT OF COMMISSIONERS—NOTICE—PUBLICATION.

The petitions for appointment of commissioners to assess damages for the taking of real estate for purposes of the road, as provided for by that chapter, described the real estate to be taken as "so much of the privilege, easement, or other interest in said street as is taken, appropriated, or interfered with by the construction and maintenance of the elevated railroad of the petitioner." *Held*, that the petition did not authorize the acquisition of "land," within the meaning of Laws 1876, c. 198, § 2, requiring notice by publication to be given of the application for appointment of commissioners to assess the value of land contained in any street or avenue in which the owners of adjoining lands on the line of the street or avenue claim the fee or a right of property, and which is sought to be taken for the purposes of a railroad; and hence the court had jurisdiction of the proceeding, although the service by publication was not made.

3. SAME.

The term "real estate," as used in chapter 140, covers all incorporeal hereditaments, easements, rights, and privileges necessary to the construction and operation of the roads contemplated by the act.

4. SAME—PETITION—DESCRIPTION OF LAND.

The roads having been constructed at the time the condemnation proceedings were instituted, such petitions sufficiently designate what real estate is to be compensated for; especially as the reports of the rapid-transit commissioners, which are matters of record, contain the specifications and requirements according to which the roads were to be built; and the petitions allege that they were so built, and ask for so much real estate as has been taken for the roads so constructed.

5. SAME—OFFERS TO PURCHASE.

The railroad companies, shortly before filing their petitions, personally served written offers to purchase upon the owners of some of the parcels of land sought to be acquired; mailed offers to the owners of other parcels; left offers as to other parcels with some person upon the premises, which in some cases came to the notice of the owners; and all these offers were declined, or taken no notice of, or the counter-offer was considered exorbitant by the company. Most of the owners had already sued for damages for the taking of their property, and in their verified complaints had placed the value of the property at sums which the companies considered grossly extravagant. *Held* that, as the estimates of value entertained by the owners and the companies differed so widely as to render it almost certain that the offer to purchase would be rejected, the efforts made by the companies were a sufficient compliance with Laws 1850, c. 140, requiring a railroad company, before instituting condemnation proceedings, to make a *bona fide* and unsuccessful effort to purchase the property sought to be taken.

6. SAME—BURDEN OF PROOF.

Laws 1850, c. 140, § 15, providing that land-owners whose interests are to be affected by condemnation proceedings may show cause against granting the petition, and may disprove any of the facts alleged in it, requires the owners to disprove the allegations of the petition capable of disproof, but not those allegations peculiarly within the knowledge of the petitioners; and, as the allegations of the petition concerning the offers to purchase involved matters as much within the knowledge of the owners as of the companies, it was for the owners to show that they did not in fact receive the offer, or, if they did receive it, why they did not accept, or make a counter-offer; and that there was reasonable ground to suppose that further negotiations might have resulted in an agreement to purchase the real estate.

7. SAME—RIGHT TO EXERCISE THE POWER—LEASED RAILROAD.

A railroad corporation, whose road is leased to another company, may nevertheless exercise the right of eminent domain.

8. SAME—PRIOR CONSTRUCTION OF ROAD.

A railroad corporation may condemn real estate over which its road was built at the time the condemnation proceedings were instituted.

9. SAME—PENDENCY OF ACTIONS FOR DAMAGES.

The companies may maintain condemnation proceedings as to those parcels the owners of which have sued the companies for damages.

10. SAME—DEATH OF OWNERS.

That the owners of some of the parcels sought to be acquired were dead, and that, as to other parcels, only part of the owners were served with notice, does not deprive the court of jurisdiction of the condemnation proceedings; as, in cases where the owners are dead, the parcels may be omitted from the orders, and in cases where only part of the owners were served those not served can be afterwards brought in by amendments.

**11. Same—Amount to be Taken.**

That a small portion of the stations of an elevated railroad were used for newsstands does not prove that stations of smaller size would adequately accommodate the traveling public, and does not prevent the company from acquiring title, by condemnation, to the real estate on which the stations are built.

**12. Same—Failure to Include All Land Taken.**

Condemnation proceedings need not include all the real estate of a particular owner, taken for the purposes of the roads; as the companies may acquire real estate in one street, although they do not acquire title to real estate actually taken in another street.

Proceedings to condemn easements for elevated railroads.

Andrews, J. These proceedings were commenced by the Metropolitan Elevated Railway Company and the New York Elevated Railroad Company for the purpose of acquiring title to certain real estate in the city of New York. Many of the owners of such real estate appeared upon the hearing, and opposed the appointment of commissioners; and as most of the objections then raised, and afterwards embodied in the various demurrers, answers, affidavits, and briefs, which have been submitted, relate to each proceeding, all the cases may properly be considered together.

The first question to be determined is whether the petitioning companies are authorized by law to institute and maintain these proceedings; and, if they are, from what statutes such authority is derived. Chapter 697 of the Laws of 1866, and chapter 489 of the Laws of 1867, vested the West-Side & Yonkers Patent Railway Company with all the powers relative to acquiring real estate which were conferred upon railroad companies formed under the general railroad act, (chapter 140, Laws 1850,) and the acts amendatory thereof. Chapter 595 of the Laws of 1875 secured to the New York Company "all the rights, powers, privileges, and franchises of the West-Side Railroad Company," which had been purchased by it. Subsequently, through the action of the rapid-transit commissioners, pursuant to section 36 of chapter 606 of the Laws of 1875, the New York Company obtained the right to construct, operate, and maintain its East-Side lines, and was vested with the same power to condemn real estate for those purposes which it already had for the purposes of its West-Side lines. All questions as to the power of the New York Company to maintain condemnation proceedings have been settled by the decision of the court of appeals in *Re Railroad Co.,* 70 N. Y. 327. In that case Earl, J., delivering the opinion of the court, said: "No railway could have the benefit of these provisions except it had an elevated railway in actual operation at the time of the passage of the act. * * * Such company has the further power, by the last clause of section 36, to construct the connections, with all the rights and with like effect as though the same had been a part of the original route of the railway; that is, among other things, it has the power given to it by its charter to institute proceedings to acquire the title to real estate needed for the connecting route, as if it were engaged under its charter in constructing its original road. * * * It is entirely clear that this company has all the authority conferred in the general railroad act to take and acquire real estate for the purposes of its road, by special proceedings provided; and section 36 of the rapid-transit act provides that the elevated railroad company may construct the connecting routes, ' with all the rights and with like effect as though the same had been a part of the original route of such railway.' Hence it seems to me that there is no room for doubt that ample provision is made for compensation for any property rights the abutting owners may have in the streets."

With regard to the Metropolitan Elevated Railway Company, chapter 885 of the Laws of 1872 conferred upon that corporation all the rights, powers, and privileges, and made it subject to all the provisions, of the general railroad act, (chapter 140, Laws 1850,) except so far as the provisions of said chapter 140 were modified by, or were inconsistent with, the provisions of

said act of 1872. And section 5 of said chapter 885, while expressly authorizing said corporation to acquire title to such real estate and interest therein as may be necessary to enable it to construct, maintain, and operate its railway in the manner specified in said general railroad act, provides that, in any of the proceedings taken for that purpose, "it shall not be necessary that the petition to the courts shall make allegation for reference to any incorporations, capital stock, surveys, maps, or the filing of any certificate of location." Section 36 of chapter 606 of the Laws of 1875 also contains the following provision: "Whenever the route or routes determined upon by said commissioners coincide with the route or routes covered by the charter of an existing corporation formed for the purpose provided for by this act, provided that said corporation has not forfeited its charter, or failed to comply with the provisions thereof, requiring the construction of a road or roads within the time prescribed by its charter, such corporation shall have the like power to construct and operate such railway or railways, upon fulfillment of the requirements and conditions imposed by said commissioners, as a corporation specially formed under this act." It is very clear, in view of the provisions of the statutes hereinbefore cited, of the action of the rapid-transit commissioners, and of the decision of the court of appeals in 70 N. Y., above referred to, that both the Metropolitan Company and the New York Company have all the powers, in regard to acquiring real estate for the purposes of their incorporations, which are given by chapter 140 of the Laws of 1850, and the acts amendatory thereof, to corporations formed under that law; and that, in taking legal proceedings to acquire such real estate, they have the right to follow the mode of procedure prescribed in said chapter 140, and the amendments of it. I am also of the opinion that the term "real estate," as used in said statutes, covers all the incorporeal hereditaments, easements, rights, and privileges which it is sought to acquire in these various proceedings. Inasmuch, therefore, as both companies are authorized by law to institute and maintain these proceedings, under and pursuant to said chapter 140 of the Laws of 1850, and its amendments; and as the several petitions ask for the appointment of "three" commissioners only, as provided for in that statute, and not for "five" commissioners, as provided for in the rapid-transit act,—I think that all questions as to the mode of procedure must be determined by reference to the provisions of said chapter 140, as amended; and that it is not necessary to decide whether these proceedings might have been taken under the sole authority of the rapid-transit act, nor whether the mode of procedure conforms to the provisions of that act.

*Secondly.* It is objected that the court has no jurisdiction of these proceedings, because notice of the application for the appointment of commissioners has not been served by publication, as required by section 2 of chapter 198 of the Laws of 1876. This objection is not well founded, because that section applies to those cases only where "land" required by a railroad company is contained in, or forms part of, a street or avenue, in a city or village, in which the owners of adjoining lands on the line of such street or avenue claim a right of property, or the fee thereof. It is settled by numerous decisions that the term "land" includes such real property only as has corporeal existence, and that it excludes incorporeal hereditaments. *Commissioners' Attachment,* 2 Abb. Pr. (N. S.) 86; *Mott* v. *Palmer,* 1 N. Y. 569; *Green* v. *Armstrong,* 1 Denio, 554; *Canfield* v. *Ford,* 28 Barb. 338; *Mitchell* v. *Warner,* 5 Conn. 515; *Johnson* v. *Richardson,* 33 Miss. 464. In *Re Railroad Co.,* 77 N. Y. 248, MILLER, J., referring to the statute in question, said: "The second section of chapter 198, Laws 1876, has no application to this proceeding, but applies only to a case where the land itself is required by the railroad company for its roadway. * * * The act of 1876, c. 198, § 2, which requires publication in two newspapers only, applies where the owners of 'adjoining lands on the line of the street' have the fee, and the right is sought to be extinguished."

It is true that the point actually decided in that case was that the said provision of the act of 1876 did not apply to a case where a railroad company took proceedings to acquire the fee of certain land, not for its roadway, but for other "purposes of its incorporation;" but the views of Judge MILLER, above quoted, in regard to the construction of this statute, are continued in the opinion, which was adopted by a majority of the judges; and, even if they were to be regarded as *obiter dicta*, must be regarded as a formal and deliberate expression of the views of such majority. It is apparent from the language used in the petitions that the petitioners do not seek to acquire the fee of any "land." The general description of the real estate which they seek to acquire is as follows: "So much of the privilege, easement, or other interest in said street as is taken, appropriated, or interfered with by the construction and maintenance of the elevated railroad of the petitioner, belonging to or claimed by ———, and appurtenant to the lot and premises known as ———, and bounded and described as follows." Then follows a description of the lot and premises, either by reference to numbers on certain maps, or by metes and bounds. The words "other interest" might, perhaps, be construed as including land contained in, or forming part of, the street, but for the use of the word "appurtenant," which has a well-defined meaning, and limits the real estate which can be acquired in this proceeding to incorporeal hereditaments. In *Root* v. *Wadhams*, 107 N. Y. 394, 14 N. E. Rep. 281, PECKHAM, J., said: "Nothing passed by the word 'appurtenance,' except such incorporeal easements, rights, and privileges as are strictly necessary and essential to the proper enjoyment of the estate granted." In *Griffiths* v. *Morrison*, 106 N. Y. 170, 12 N. E. Rep. 580, the same learned judge says: "By the word 'appurtenances,' incorporeal easements, or rights or privileges, will alone pass; and of these only such as are necessary to the proper enjoyment of the estate granted." In *Jackson* v. *Hathaway*, 15 Johns. 454, the court said: "It would be absurd to allow the fee of one piece of land, not mentioned in the deed, to pass as appurtenant to another distinct parcel." See, also, *Ogden* v. *Jennings*, 62 N. Y. 531; Washb. Real Prop. (5th Ed.) 418; *Leonard* v. *White*, 7 Mass. 6; *Harris* v. *Elliott*, 10 Pet. 25, 54. I am of the opinion that, in view of the language used in the several petitions, the petitioners could not, even if they desired to do so, acquire in these proceedings any "land" within the meaning of that term as used in section 2 of chapter 198 of the Laws of 1876; and consequently the court has jurisdiction of the proceedings, although no service by publication was made, as provided for in that statute. It may not be out of place to remark that the objection of no service by publication is a purely technical one, because written notice of these applications for the appointment of commissioners have been served upon the abutting property owners personally, or in such other manner as is provided in chapter 140 of the Laws of 1850; and it is of no possible consequence to such property owners that they have not also been constructively served by "publication" in two newspapers. I may also add that the counsel for the petitioning companies, in open court, and in the briefs submitted by them, have stated that the petitioners have no desire or intention to acquire through these proceedings any "land," but only certain incorporeal hereditaments, and the order to be entered in such case can be drawn in accordance with such statement.

*Thirdly.* It is objected that the petitioners have not made such efforts to agree for the purchase of the real estate required as are a legal prerequisite to the right to acquire the same by these proceedings. This is, to my mind, the most serious of all the objections raised on behalf of the property owners; but I have finally concluded, though with some doubt and hesitation, that it should be overruled. The act, (chapter 140, Laws 1850,) as construed by the courts, undoubtedly contemplates that, before a railroad company can maintain proceedings in court to condemn real estate, it should make a *bona fide* and unsuccessful effort to purchase the same. In the cases at bar the petitioners

claim that they did make *bona fide* efforts to purchase some of the parcels, but that the same were not successful; and that, as to the remaining parcels, such a state of facts existed as demonstrated that any effort to purchase them would be utterly futile, and therefore the petitioners were, as matter of law, excused from making such effort.   Upon the hearing some question was raised as to whether the burden of proof was upon the property owners to disprove these allegations of the petitioners, or upon the petitioners to offer proof to sustain such allegations; but the court received all the evidence which was offered, either by the petitioners to prove efforts to purchase, or facts excusing such efforts, or by the property owners to prove that no efforts to purchase had been made.   As to some parcels the petitioners proved that offers, partly printed and partly written, to purchase the real estate required, had been personally served on the property owners; as to other parcels, that similar offers had been duly mailed to the owners; and, as to other parcels, that similar offers had been left with some person upon the premises; and that, in some cases, offers so left had been delivered to, or come to the notice of, the owners.   In all these cases, whatever the manner of making the offer was, it was proved that the offer was either declined, or that no notice was taken of it; and that either no counter-offer at all was made, or the counter-offer was considered exorbitant by the officers of the petitioners.   The owners of many parcels proved that the petitioners made no efforts to purchase their real estate, except through the offers above mentioned.   It is claimed on behalf of the property owners that these various efforts to purchase were not made in good faith, but were merely attempts on the part of the petitioners to do something which would seem to be a compliance with the requirement of the statute that they should make an effort to purchase before commencing legal proceedings.   It is claimed that this want of good faith is shown by the smallness of the offers, the fact that they were uniformly the same, and that they were made but a short time before these proceedings were commenced.   It certainly would not have been difficult for the officers of the petitioners to have conducted their negotiations with the property owners in such a manner that no question as to their good faith would have been raised; but, notwithstanding that fact, upon the evidence before me, I do not see how I can find that the offers were not made in good faith, or that the requirements of the statute have not been satisfied.   In most of the cases where these offers were made the property owners had already brought actions to recover damages, and in their verified complaints had placed their damages at sums which the officers of the companies considered grossly extravagant and exorbitant.   Such officers, therefore, had some ground for believing that no offer which they would consider reasonable would be so regarded by the property owners; and that, as any effort which they felt at liberty to make would certainly be rejected, it was not very important what the precise figures of the offers were.   Moreover, there is absolutely no evidence before me from which I can form an opinion as to the fair value of the real estate to be acquired, in any case; and I cannot, therefore, decide that the offers made by the companies were in fact preposterously small, as is claimed by counsel for property owners, and made with no idea that they would be accepted.   Nor did it follow, because the offers were made but a short time before these proceedings were commenced, that they were not made in good faith.   There was time enough in most cases between the receipt of the offers and the commencement of the proceedings to have made counter-offers; but very few such counter-offers were made, and those that were made were considered unreasonable and extravagant by the officers of the petitioners.   Nor can I find, upon the evidence before me, that the statute has not been complied with because the offers were the same in each case.   There is no evidence from which I can determine, even approximately, what the value of the real estate to be acquired is in any single case.   Besides, it is claimed by counsel for the petitioners that whatever difference there may be in the measure of damages for part injuries to different lots, the

value of the easement or right, which is to be taken in these proceedings, is no greater when a lot has been built upon than when it is vacant; that, consequently, such value depends, in every case, upon the size of the lot; and that offers of a certain sum per front foot were fairly and properly made. With regard to a number of parcels it does not appear that any offers of purchase were ever made; but in all these cases suits for damages, brought by the several property owners, were pending when these proceedings were commenced, and the pleadings in these suits have been put in evidence.

The amounts claimed by the property owners in the actions are very large, and in the aggregate amount to an immense sum. The complaints are, in most cases, verified. The answers interposed by the defendants deny any liability whatever. In view of the existence of these suits, and of other surrounding circumstances, I am satisfied that all efforts on the part of the petitioners to purchase the real estate required, in all cases where such suits were pending, would have been wholly fruitless. Numerous cases affecting the elevated railroads built in this city have been decided by the courts within the past few years, and from the reports of those cases some facts may be ascertained which throw light on the matter now under consideration. There can be no doubt that the persons or companies which constructed the elevated railroads did not originally suppose they would be compelled to pay anything for damages caused by the erection and operation of the roads to the property of abutting owners. After years of litigation it has been finally settled by the court of last resort that some liability for such damages does exist. Under these circumstances, perhaps, it is not surprising that the views of the officers of the railroads, and those of the property owners, as to the amount of damages already suffered, and which will be hereafter suffered, are very far apart; though it by no means follows that their respective views are not honestly entertained by such officers, as well as by the property owners. The situation, then, is this: A large number of property owners bring actions claiming damages at from (say) $5,000 to $50,000. The complaints are verified; and, when the property owner swears that he has been damaged thousands of dollars, the officers of the railroad companies have a right to assume that he believes what he says, and that he will not accept any sum which is very much less than what he claims. Accordingly an answer is served in each case denying all liability. Under these circumstances must the officers of the companies, in order to comply with the statute, which contemplates an effort to purchase before proceedings are commenced, go through the idle ceremony of offering a small sum, which is all that they honestly think the property owner is entitled to, although they are absolutely certain that the offer will be rejected? I think not. It seems to me that the situation presented in *Re Village of Middletown*, 82 N. Y 200, was similar to that presented by the facts in the cases at bar. In that matter, FINCH, J., in the course of his opinion, said: "It is quite evident that negotiations had gone far enough between the the trustees and these parties to indicate that an agreement was impossible. The former were not called upon to name a price, when that fixed by Norbury was so extravagant as to amount practically to a refusal. An effort to agree is all that is required; not a series of efforts, or a negotiation prolonged into a debate." And it was held in that case that where an owner put a price upon his property 10 times above its value it was equivalent to a refusal to come to an agreement. Upon the whole, I am fully satisfied that, in cases where suits were pending, any formal negotiation would have been as fruitless as it proved to be in those cases where offers were actually made; and I think that the objection that the statute, which required a previous effort to acquire the real estate covered by the several proceedings, has not been complied with, should be overruled.

*Fourthly.* It is objected that, inasmuch as most of the property owners have commenced actions for damages against the railroad companies, these proceedings cannot be maintained as to parcels owned by persons who have brought

such actions. This objection was considered and overruled by Mr. Justice BARRETT, in *Re Railway Co.*,[1] and I concur in the views expressed by him in a decision published in the Daily Register of April 14, 1888.

*Fifthly.* It is objected that these proceedings cannot be maintained because the petitioning companies have been leased to the Manhattan Railway Company for a long term of years. This objection is not well founded, because it has been repeatedly decided that the leasing of the line of a railroad corporation to another corporation does not deprive the former of the power to exercise the right of eminent domain. *Kip* v. *Railroad Co.*, 6 Hun, 24, 67 N. Y. 227; *In re Railroad Co.*, 99 N. Y. 12, 1 N. E. Rep. 27.

*Sixthly.* It is objected that these proceedings cannot be maintained, because the roads of the petitioners had been built before the proceedings were commenced. This objection was also considered and overruled by Judge BARRETT in *Re Railway Co., supra,* and I concur in his views. The decision in *Re Townsend,* 39 N. Y. 171, cited to sustain this objection, has no application. It was decided in that matter that an act of the legislature, authorizing commissioners appointed by the court to assess damages previously caused by a continuing trespass upon certain lands, was unconstitutional. It is expressly conceded by the counsel for the petitioners that the commissioners, whose appointment is asked for in these proceedings, will have no power to assess or determine the damages heretofore suffered by the property owners, and the orders to be entered can so provide.

*Seventhly.* It is objected that the petitioners do not conform to the provisions of the railroad act of 1850, by setting forth that the petitioners intend in good faith to construct and operate railroads between certain points. As the railroads in question were long since completed, and are now in operation, such an allegation could not possibly be true, and therefore it would not have been proper to insert it in the petitions. Moreover, this objection is raised in a proceeding taken by the Metropolitan Company; and chapter 885 of the Laws of 1872 appears to expressly provide that this and other similar allegations need not be inserted in petitions for the condemnation of real estate which are presented to the court by this company. Ever since the passage of the act of 1850 it has not been unusual for railroad companies, whose lines have been built, to acquire additional real estate for the purposes of their incorporation; and the right to acquire such additional real estate as was really needed for any purpose of their incorporation has never been successfully questioned upon the ground that the road had been already constructed.

*Eighthly.* It is objected that the persons named in the petitions as the owners of some parcels are dead, and that, as to other parcels, only part of the owners have been served. In those cases where the persons named as owners are dead, the parcels can be wholly omitted from the orders. In those cases where only part of the owners have been served, the parcels can be included in the orders, and the parties not served can hereafter be brought in by amendments.

*Ninthly.* The objection is made that portions of some stations are used for news-stands; that such use of stations is unlawful; and that real estate cannot be acquired for such unlawful purpose. I do not see why it is not just as lawful to have news-stands in the stations of the elevated roads as in the stations of surface steam roads, and I am not aware that the legality of the latter has ever been questioned. Without, however, attempting to decide this question, it is sufficient for present purposes to say that the fact that a small portion of certain stations of the elevated roads is used for news-stands does not prove that stations of smaller size would adequately accommodate the traveling public, or afford sufficient space for the various purposes of the companies, the legality of which is not disputed. It is certainly an extraordinary proposition that a railroad company cannot condemn real estate absolutely necessary

[1] Decided before the publication of the New York Supplement was commenced.

for the purposes of its incorporation because a small corner in a station-house is used as a news-stand, which is a great convenience to all persons traveling on these roads. If these corporations are exercising powers not conferred upon them by their charters, the law has provided another and more suitable remedy than a denial of the power to acquire real estate through the exercise of the right of eminent domain.

*Tenthly.* It is objected that the petitions do not sufficiently describe the real estate to be taken. The roads have been constructed, and are in operation, and the petitioners set forth that the companies desire to acquire so much of the easement, privilege, or interest of the abutting owners in the streets as has been taken by the petitioners for their use. Under this specification I do not see how there can be the slightest difficulty in determining just what real estate is to be compensated for. The court of appeals has settled exactly what is the nature or kind of damages for which the property owner is entitled to be paid; and, as the various lines have been for a long time and now are in daily operation, the nature and extent of the damages done to each parcel described in the several petitions is just as susceptible of identification and proof as any other facts which are to be established in a court of justice. Besides, the reports of the rapid-transit commissioners, which are matters of record, contain the specifications and requirements according to which the roads were to be built; the petitions allege that the roads were built in conformity with those specifications and requirements, and there is no proof before me to the contrary; and the petitions ask for so much real estate as has been taken for roads so constructed. Such reports and petitions, therefore, taken together with the orders to be entered, will constitute a complete record of what real estate has been taken. In the case of *In re Railroad Co.*, 1 N. Y. Supp. 797, the specifications and requirements contained in the report of rapid-transit commissioners appointed in that city were the same as those contained in the reports of the commissioners who located the elevated roads in the city of New York; and it was decided by Mr. Justice PRATT that such specifications and requirements were drawn in conformity with the rapid-transit act of 1875, and were a sufficient compliance with its provisions. Moreover, as to the New York Company, all questions as to its organization, right to condemn property, and the sufficiency of the plans according to which the road was built, have been passed upon by the commissioners appointed by the general term, to determine whether the road should be built, and by the general term itself; and those questions would seem to be *res adjudicata,* so far as concerns all persons who were heard, or might have been heard, upon the application for the appointment of such commissioners, or for the confirmation of their report; and among such persons were the abutting property owners.

*Eleventhly.* The objection that all the real estate belonging to a particular owner, and which, as the owner claims, has been taken for the purposes of the petitioners, is not included in these proceedings, is untenable. The companies have an undoubted right to acquire easements, rights, or privileges in one street, although they do not seek to acquire easements, rights, and privileges in other streets, which, it is alleged, have actually been taken or interfered with.

*Twelfthly.* It is claimed by the counsel for some of the property owners that, inasmuch as certain allegations of the petitions were denied in the answers or affidavits submitted on behalf of such owners, the burden of proving these allegations by competent evidence was thrown upon the petitioners. The law as to whether the petitioners or the property owners have the burden of proof, in proceedings of this character, is not in a very satisfactory condition. Section 15 of chapter 140 of the Laws of 1850 provides that, when the petition is presented to the supreme court, any of the persons whose estates or interests are to be affected may show cause against granting the prayer of the petition, and may disprove any of the facts alleged in it. In *Railroad Co.* v. *Reynolds,* 6 How. Pr. 97, MARVIN, J., at Erie special term, in 1851, said:

"If the person whose estate or interest is affected denies any of the facts alleged in the petition, an issue is then formed, and the statute imposes upon him the burden of proof. He may disprove the facts alleged." The same question came before the general term of the First department in 1875, in *Re Bridge Co.*, 67 Barb. 295, and was decided in the same way. BRADY, J., speaking for the court, in the course of his opinion, said: "The fifteenth section of the railroad act (Laws 1850, p. 211) puts upon the owner of land the burden of proving, and by legal evidence, that the facts alleged in the petition are not true. And an affidavit or answer is not sufficient for that purpose," (citing 6 How. 97, *supra*.) "The decision rests upon the language of the statute, which provides that all persons whose estates or interests are to be affected by the proceedings may show cause against granting the prayer of the petition, and may disprove any of the facts alleged in it." These decisions must undoubtedly be regarded as modified by the decisions of the court of appeals in *Re Railroad Co.*, 66 N. Y. 407; *In re Railroad Co.*, 77 N. Y. 557; and *In re Railroad Co.*, 99 N. Y. 12, 1 N. E. Rep. 27,—but to what extent they have been so modified it is not easy to determine. In the case in 66 N. Y. the petition contained a number of allegations which, it was evident, the property owners had no means of disproving, although they were denied in their answers. Speaking of these, RAPALLO, J., said: "These are allegations the negatives of which were not capable of proof by one not cognizant of the plans and intentions of the corporation. We think it was incumbent upon the company to give proof in support of these allegations, and that the provision of the statute that the land-owner may disprove the allegation was intended to enable him to introduce proofs on his part to meet those offered by the petitioners, and to disprove any allegations in the petition which were capable of being disproved; but that as to others it was sufficient if he showed sufficient cause against the petition to put the petitioners to proof of matters lying specially within its own knowledge." According to this decision, the allegations of the petition which, if denied, it is for the petitioner to prove, are those which are specially within its own knowledge, and which, from their nature, it is impossible for the property owner to disprove; but it was also held that the burden was on the property owner "to disprove any allegations in the petition that were capable of being disproved." In the case in the 77 N. Y. the Lockport & Buffalo Railroad Company presented a petition for the appointment of commissioners to settle the points and manner of crossing the tracks of the New York Central & Hudson River Railroad Company. The petition alleged that the petitioner had in good faith endeavored to agree with the persons interested as to acquiring such right, and the amount of compensation. This allegation was denied in the answer. The petitioner offered no proof, but the respondent offered evidence to disprove such allegation. The court refused to allow such proof, and made an order appointing commissioners, which was affirmed by the general term, but was reversed by the court of appeals. EARL, J., speaking for the court, said: "When this answer was put in, the petitioner should have either withdrawn its petition, and then made efforts to agree with the appellant, or it should have been prepared to prove that such efforts had been made. Whether such efforts had been made was peculiarly within its own knowledge. It knew when and where and with which one of the numerous agents of the appellant such efforts had been made; and hence it was bound to prove the facts thus put in issue." It will be observed that the reason given for this decision is that the matter in issue was peculiarly within the knowledge of the petitioner. In the case in 99 N. Y., FINCH, J., in his opinion, refers to the decision in 67 Barb., *supra*, and then says: "But in *Re Railroad Co.*, 66 N. Y. 407, this court refused to go so far, and held, in substance, that, as to specific allegations capable of being disproved, the burden was upon the land-owner; but as to those of which the need of the property for the purposes of the railroad was the example, which

were not capable of being disproved, it was enough if he showed sufficient cause against the petition to put the petitioner to proof as to matters lying specially within its knowledge." The conclusion to be drawn from all these decisions appears to be this: With regard to allegations of the petition capable of being disproved by the land-owner, the burden of proof is upon him; but with regard to allegations which, from the nature of the case, the landowner cannot disprove, because the matters involved are peculiarly or exclusively within the knowledge of the petitioner, the burden of proof is upon the latter. This is the nearest approach to certainty which we can make in the present state of the decisions of the court of appeals, and the difficulty is to determine what allegations are "capable of being disproved by the property owner." Applying this rule to the case at bar as well as I can, it seems to me that, as to any and all of the allegations of the petitioner which are denied in the answers and affidavits, the matters involved are as much within the knowledge of the property owners as of the petitioners, or that the petitioners have put in such proofs as to call upon the property owner, in the language of Judge RAPALLO, "to introduce proofs, on his part, to meet those offered by the petitioners." For instance, the petitioners proved, in some cases, that offers to purchase were sent to property owners, or left with persons who, it might fairly be presumed, would deliver them to the persons for whom they were intended. In such cases it is for the property owner to prove, if such be the fact, that he did not receive the offer; or, if he did receive it, why he did not accept, or make a counter-offer; or, if he so claims, that the offer was not made in good faith. So, also, the petitioners having proved that property owners had brought actions against the petitioners, seeking to recover large damages, which the petitioners considered exorbitant, and in which actions answers were interposed denying all liability for damages, it was for the property owners to put in proof, if any they had, showing that there was some reasonable ground for supposing that further negotiations might have led to agreements for the purchase of the real estate required. So, too, if the property owners seriously claim that the specifications and requirements contained in the reports of the rapid-transit commissioners were not drawn in accordance with the act of 1875, or that the road was not in any particular respect constructed according to such specifications and requirements, it is for the property owner to substantiate such claim by legal existence.

*Lastly.* My conclusion upon the whole matter is that all the objections should be overruled, and that commissioners should be appointed in each proceeding, as prayed for in the respective petitions. The orders will be settled on notice. For the sake of uniformity and convenience I have concluded to appoint the same commissioners in all the proceedings. In view of the magnitude of these proceedings, and especially of the great difference of opinion between the officers of the petitioners and the property owners as to the value of the real estate to be acquired, it is, of course, of the highest importance that the commissioners should be persons in whom both the petitioners and the property owners will have entire confidence. In order to secure such commissioners I have concluded to adopt a plan for their selection somewhat similar to that established by the act of April 20, 1839, for the appointment of commissioners in street-opening proceedings. The petitioners may nominate persons to the court, one of whom will be appointed a commissioner, if found to be disinterested, impartial, and free from all objection. Any of the property owners may also make like nominations, and one of the persons so nominated will be appointed a commissioner, if found to have like qualifications. The two persons so appointed, with a third person to be selected by me, will constitute the commission. If none of the persons nominated by either the petitioners or the property owners proves to be satisfactory, the other commissioner or commissioners will also be selected by me. Such nominations may be made upon the settlement of the orders.